# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
January 23, 2014 Session

## SECURAMERICA BUSINESS CREDIT v. KARL SCHLEDWITZ, ET AL

### Appeal from the Circuit Court for Shelby County
### No. CT00180307    Donna M. Fields, Judge

---

## No. W2012-02605-COA-R3-CV - Filed March 28, 2014

---

This is the second appeal involving liability on personal guaranties securing the debt of a transportation company. On remand after our first opinion, the trial court found that the transportation company and the lender, through the actions of its president, entered into a conspiracy to violate the Tennessee Consumer Protection Act and violated the duty of good faith and fair dealing, relieving the guarantors of their liability under the continuing guaranties. The trial court, however, declined to hold that the lender and transportation company committed fraud or that the sale of the transportation company from the guarantors to its current owner was a sham. We affirm the trial court's rulings with regard to (1) the actions of the lender's president being imputed to the lender; (2) that the sale of the transportation company was not a sham; (3) that no fraud was committed; and (4) that the guaranties at issue are continuing. We further hold that the trial court was entitled to consider both the underlying credit agreement and the guaranties in determining whether the duty of good faith was breached. However, we vacate the trial court's judgment with regard to its findings of conspiracy, a violation of the Tennessee Consumer Protection Act, and breach of the duty of good faith. We further vacate the trial court's judgment that the guarantors may avoid the obligations under the guaranties. We remand to the trial court for further findings of fact and conclusions of law on these issues.   Affirmed in part, vacated in part, and remanded.

### Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Vacated in Part; and Remanded

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and D. MICHAEL SWINEY, J., joined.

W.O. Luckett, Jr., Clarkdale, Mississippi and Lorrie K. Ridder, Memphis, Tennessee, for the appellant, SecurAmerica Business Credit.

David J. Cocke, Memphis, Tennessee, for the appellees, Karl Schledwitz and Terry Lynch.

## OPINION

## I. Background

This is the second appeal in this case. In the first appeal, this Court remanded to the trial court for further findings of fact and conclusions of law. *See **SecurAmerica Business Credit v. Schledwitz***, No. W2009-02571-COA-R3-CV, 2011 WL 3808232 (Tenn. Ct. App. August 26, 2011) (hereinafter "***SecurAmerica I***"). On remand, the trial court adopted this Court's "background facts and procedural history . . . as correct," noting that this Court's Opinion was "largely correct." Accordingly, we take the background facts and procedural history from our prior Opinion, with some minor changes to conform to the trial court's findings of fact[1] According to our prior Opinion:

> [Appellant] SecurAmerica Business Credit ("SecurAmerica") brought this action on March 27, 2001, against Southland Transportation Co., LLC ("Southland Transportation"), Southland Capital Co. ("Southland Capital"), and Appell[ees] Karl Schledwitz and Terry Lynch. SecurAmerica's claims arose from an alleged default on the September 16, 1999 Secured Revolving Credit Agreement ("Credit Agreement"), which was entered by and between SecurAmerica and Southland Transportation. This Credit Agreement was personally guaranteed by Appell[ees], who were the co-equal owners of Southland Transportation at that time.

---

[1] For purposes of clarification, in ***SecurAmerica I***, the trial court ordered Karl Schledwitz and Terry Lynch to pay the amounts owed pursuant to identical individual guaranties. They appealed, and thus, were designated as the Appellants on appeal. After the remand, however, the trial court modified its previous decision to rule that Mr. Schledwitz and Mr. Lynch were relieved of liability on the individual guaranties by SecurAmerica Business Credit's bad faith and participation in a civil conspiracy. SecurAmerica Business Credit has appealed that ruling, and thus, is the Appellant in this appeal. Consequently, Mr. Schledwitz and Mr. Lynch will be referred to as the Appellees in this Opinion.

2

When it entered the Credit Agreement, SecurAmerica was a lender licensed by the State of Tennessee under the Tennessee BIDCO[2] Act, *see* Tenn.Code Ann. § 45-8-201 *et seq.*, which gave it the authority to make loans to businesses that would not otherwise qualify for traditional financing. SecurAmerica's typical client was a small-to medium-sized business that was highly leveraged and presented a higher level of lending risk. Southland Transportation, a trucking company, was such a business.

The Credit Agreement between SecurAmerica and Southland Transportation was structured as a revolving line of credit and was intended to provide working capital for the trucking company based on the value of certain current assets. To secure the line of credit, SecurAmerica took a security interest in several of the assets of Southland Transportation. The primary assets with value, and the intended sources of repayment, however, were Southland Transportation's working assets, specifically, its accounts receivable.

Per the terms of the Credit Agreement, SecurAmerica lent Southland Transportation money on a revolving basis based on the value of certain current assets (i.e., the "borrowing base"). Consequently, the assets that made up the borrowing base were to be reported, monitored, and evaluated on a daily basis. In order to obtain funds, Southland Transportation submitted daily borrowing base certificates to SecurAmerica. These borrowing base certificates identified the amount of eligible accounts receivable that Southland Transportation maintained on its books.[3] Based upon the amount listed on the borrowing base certificates, SecurAmerica would advance monies to Southland Transportation to fund its daily operations. To pay down the loan balance, Southland Transportation maintained a bank account called a "blocked account," into which it directed its customers to send their invoice payments. As these payments accrued in the blocked account, monies

---

[2] BIDCO is an acronym for a "business and industrial development corporation." Tenn. Code Ann. § 45-8-203(4).

[3] Eligible accounts were generally defined by the Credit Agreement to be accounts arising out of sales in the ordinary course of business that were not more than ninety days old.

would be wired directly to SecurAmerica to be applied to the balance of the line of credit. This was the basic procedure for lending and repaying monies as outlined in the Credit Agreement.

*SecurAmerica I*, 2011 WL 3808232, at *1–*2 (footnotes in original). The terms of the Credit Agreement further provide that: "Each Loan Party hereby waives any right to require the Lender to marshal any of the Collateral or otherwise to compel the Lender to seek recourse against or satisfaction of the Liabilities from one source before seeking recourse or satisfaction from another source."

In addition to the Credit Agreement and Promissory Note, Mr. Schledwitz and Mr. Lynch both signed individual Guaranties securing the loan. As explained in *SecurAmerica I*,

> As a condition to lending money to Southland Transportation, SecurAmerica required the interested parties to take additional actions. First, Mr. Schledwitz agreed to sign a Guaranty of Validity of Collateral in favor of SecurAmerica, whereby he guaranteed that the collateral securing the Credit Agreement, specifically the accounts receivable, were bona fide, existing accounts in accordance with the terms of the Credit Agreement. Mr. Schledwitz's Guaranty of Validity of Collateral stated that it was a continuing agreement that remained in effect until any liabilities incurred under the Credit Agreement had been paid in full. Second, Southland Capital, a separate company owned and operated by Appell[ees], signed a Subordination Agreement in favor of SecurAmerica. Southland Capital regularly lent money and infused capital into Southland Transportation as a means of supporting the struggling trucking company. By this Subordination Agreement, Southland Capital agreed to subordinate its rights to repayment by Southland Transportation to the rights of SecurAmerica. Thus, as between SecurAmerica and Southland Capital, the former was to be the senior creditor to Southland Transportation. Third, SecurAmerica required Messrs. Schledwitz and Lynch to sign a personal guaranty in the amount of $500,000 each. The personal guaranties [("the Guaranties")] were identical in substance, and provided, in relevant part, as follows:

> The Guarantor hereby (a) unconditionally

4

and irrevocably guarantees the punctual payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all of the Liabilities up to Five Hundred Thousand Dollars ($500,000) and (b) agrees to pay any and all costs and expenses (including attorney's fees and related expenses) incurred by the Lender in enforcing any rights under this Guaranty.

*SecurAmerica I*, 2011 WL 3808232, at *2. The Guaranties further provided that:

The liability of the Guarantor under this Guaranty shall be absolute and unconditional irrespective of:

(a) any lack of validity or enforceability of this Guaranty, the Agreement, the Note or any other Loan Documents;

(b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Liabilities, or any amendment or waiver of any term of or any consent to departure from the Agreement or any other Loan Document;

(c) any exchange, release or non-perfection of any collateral, or any release, amendment or waiver of any term of, or consent to departure from, any other guaranty for all or any of the Liabilities;

(d) any failure on the part of the Lender or any other person or entity to exercise, or any delay in exercising, any right under the Agreement or any other Loan Document; or

(e) any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Company, the Guarantor or any other guarantor with respect to the Liabilities (including, without limitation, all defenses based on suretyship or impairment of collateral, and all defenses that the Company may assert to the repayment of the Liabilities, including, without limitation, failure of consideration, breach of warranty, fraud, payment, statute of frauds, bankruptcy, lack of legal capacity, statute of limitations, lender liability, accord and

5

satisfaction, and usury) or which might otherwise constitute a defense to this Guaranty and the obligations of the Guarantor under this Guaranty.

Both the Guaranty of Validity of Collateral and the Individual Guaranties were specifically referenced in the Credit Agreement as exhibits. In addition, the Credit Agreement provided that "THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS EMBODY THE ENTIRE AGREEMENT AMONG THE PARTIES HERETO AND THERETO AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS."

As further explained in *SecurAmerica I*:

> The Credit Agreement provided that advances were not to exceed the lesser of (1) $1.5 million; or (2) 85% of eligible accounts receivable. Two months after its inception, in November 1999, the loan was fully funded (i.e., at its maximum loan balance of $1.5 million), and more or less remained that way while Southland Transportation was in existence. A field examination performed by SecurAmerica in June 2000 revealed that the eligible accounts receivable were sufficient to cover the advances and to protect SecurAmerica in the event of default.[4]
>
> However, this is not to say that Southland Transportation was a profitable business. The company faced significant cash flow problems, and Southland Capital repeatedly infused money into the business. With a struggling business on their hands, Appell[ees] explored opportunities to sell the trucking operation. In August 2000, Appell[ees] sold Southland Transportation to two of its employees—Michael Harrell and Michael Lucchesi.[5] Messrs. Harrell and Lucchesi did not pay a cash purchase price for their respective interests. Rather, the transaction was structured so that Appell[ees] retained certain debts of Southland Transportation, and Messrs. Harrell and Lucchesi obligated themselves on a promissory note payable to

---

[4] SecurAmerica generally conducted field examinations of Southland Transportation on a quarterly basis. It did not perform a field examination in September or December 2000.

[5] The sale was effective August 1, 2000; however, some of the closing documents were not signed until September 2000.

6

Appell[ees].[6] Messrs. Harrell and Lucchesi envisioned a leaner operation with less debt, and all four gentlemen apparently believed that the trucking company could be a viable business going forward.

This change in ownership constituted an event of default under the Credit Agreement. However, SecurAmerica did not accelerate the loan, nor did it release Appell[ees] from their personal guaranties. Rather, after the sale, SecurAmerica continued to lend money to Southland Transportation under the Credit Agreement, and Appell[ees] remained as guarantors. Notwithstanding the restructuring, or perhaps because of it, Southland Transportation continued its descent into unprofitability. Soon after the sale, thirty to forty truck drivers left, striking a blow to the company's revenue stream. Messrs. Harrell and Lucchesi were likewise unsuccessful in their efforts to bring other investors on board.

Sometime between August 2000 and February 2001, Southland Transportation began falsifying the borrowing base certificates that it submitted on a daily basis in order to acquire additional funds from SecurAmerica. These borrowing base certificates were falsely inflated to make it appear that Southland Transportation had a higher eligible accounts receivable balance than it actually did, which consequently allowed it to obtain advances from SecurAmerica in excess of that provided by the Credit Agreement. Essentially, this created an out of balance debt-to-collateral ratio because monies were advanced on the basis of accounts receivable that did not exist. For example, in August 2000, $815,000 was collected from accounts receivable and put in the blocked account to pay down the loan. That amount fell to $604,000 in September; $414,000 in October; $187,000 in November; and $24,000 in December. Thus, Southland Transportation's actual accounts receivable balance was dropping precipitously; however, all the while, the line of credit remained at its maximum balance of approximately

---

[6] SecurAmerica contended at trial that this purported sale was, in fact, a "gift" of a failing business in order for Appell[ees] to avoid liability on their guaranties. The trial court determined that it was a sale.

$1.5 million.[7]

The genesis of the false borrowing base certificates is sharply contested. Mr. Harrell testified that the falsifying began in August 2000 at the suggestion of SecurAmerica's President, Mr. Randall Reagan. Mr. Reagan testified that he was unaware of this practice until December 2000, and that he virtually ceased lending to Southland Transportation after he discovered that Mr. Harrell was falsifying the certificates. However, it is uncontroverted that, for some period of time, both Mr. Harrell and Mr. Reagan were aware that the borrowing base certificates had been falsified; nevertheless, SecurAmerica continued to make advances. In addition to the falsified borrowing base certificates, Mr. Harrell, with the knowledge and complicity of Mr. Reagan, began diverting accounts receivable remittances around the blocked account. Now, instead of being used to pay down the line of credit, as required by the terms of the Credit Agreement, this money was diverted to fund the day-to-day operations of Southland Transportation.

Mr. Reagan's complicity in the falsified borrowing base certificates apparently stemmed from his belief that continuing to lend operating capital to Southland Transportation was the best option to prevent the company from failing and defaulting on its loan. At the same time that the Southland Transportation loan was failing, SecurAmerica had several other "problem" loans in its portfolio. In fact, SecurAmerica had been placed in default by its own lender, TransAmerica. Consequently, Southland Transportation's eventual ability to pay off its debts was pivotal to SecurAmerica's ability to pay off its own debts.

Despite his knowledge that the Southland Transportation loan was failing and was now based on falsified documentation, Mr. Reagan did not inform anyone, particularly the Appell[ees] or SecurAmerica's board of directors, of the dire situation. After selling Southland Transportation in August 2000, Appell[ees] were unaware that money was being loaned based on false borrowing base certificates or that money was being diverted around the blocked account. Appell[ees] had retained the right

---

[7] The collections in January and February 2001 were approximately $69,000 and $50,000, respectively. The loan balance more or less remained at its maximum during these months as well.

to inspect the books and records of Southland Transportation when they sold the business to Messrs. Harrell and Lucchesi. However, Appell[ees] had not exercised this right and so remained uninformed as to the plight of the trucking company. Meanwhile, Southland Transportation continued to struggle. After losing its biggest customer in February 2001, Southland Transportation ceased doing business, thereby defaulting on the Credit Agreement.

In March 2001, Mr. Reagan revealed the fate of Southland Transportation to SecurAmerica's board of directors. After the board of directors learned of his actions, he was promptly fired.[8] SecurAmerica accelerated the debt ($1,485,564.45 plus accrued interest according to SecurAmerica's records). Because Southland Transportation had insufficient assets to satisfy the loan balance, SecurAmerica sought repayment from Appell[ees] under their personal guaranties. After learning of the actions of Mr. Harrell and Mr. Reagan, Appell[ees] declined to honor their guaranties.

2. Procedural History

On March 27, 2001, SecurAmerica filed its complaint in the Shelby County Chancery Court against Southland Transportation, Mr. Schledwitz, Mr. Lynch, Mr. Lucchesi, and Mr. Harrell. Essentially, the complaint sought a judgment against Southland Transportation on the promissory note, against all of the defendants for fraud in connection with the falsified borrowing base certificates, against Mr. Schledwitz individually on the Guarantee of Validity of Collateral, and against Mr. Schledwitz and Mr. Lynch on their personal guaranties.

On May 17, 2001, Appell[ees] Schledwitz and Lynch filed their answer and asserted the affirmative defense of fraud by SecurAmerica. See Tenn. R. Civ. P. 8.03. Appell[ees] also asserted, inter alia, that SecurAmerica had: (1) breached the implied covenant of good faith and fair dealing; (2) failed to

---

[8] Mr. Reagan later entered into a settlement agreement with SecurAmerica in which he forfeited his retirement account, worth approximately $540,000, in exchange for SecurAmerica's covenant not to sue.

9

preserve its collateral; and (3) significantly increased the risk of nonpayment by Southland Transportation. Appell[ees] also filed a cross-claim alleging conspiracy and fraud against Southland Transportation and Mr. Reagan, in both his individual and corporate capacities.

On January 21, 2004, SecurAmerica amended its complaint to allege new claims against Southland Transportation for breach of contract, and against Southland Capital for tortious interference with contract. SecurAmerica sought a constructive trust for the alleged breach of the Subordination Agreement. SecurAmerica also added claims against Appell[ees] and their wives, Gail Schledwitz and Robyn Lynch, for fraudulent conveyance.[9] On April 12, 2004, Appell[ees] filed their second amended answer to raise additional affirmative defenses and to amend their counterclaim against SecurAmerica and their cross-claim against Mr. Reagan and Southland Transportation to allege violations of the Tennessee Consumer Protection Act. Myriad amended pleadings, motions, and responses followed.

All claims by all the parties against defendants Harrell, Lucchesi, and Reagan were eventually voluntarily dismissed. The trial court bifurcated the fraudulent conveyance claims against Appell[ees] and their wives, and proceeded to try all other claims at a bench trial held January 7–15, 2008.

More than a year later, on January 30, 2009, the trial court entered its findings of fact and conclusions of law. Therein, judgment was rendered in favor of SecurAmerica against Appell[ees] on their personal guaranties for $500,000 each. The trial court declined to award pre-judgment interest due to its finding that Mr. Reagan and SecurAmerica had committed fraud. The trial court dismissed SecurAmerica's claims on the Guaranty of Validity of Collateral signed by Mr. Schledwitz, and on the Subordination Agreement against Southland Capital, and declined to award SecurAmerica punitive damages. The court also dismissed Appell[ees]' claims under the Tennessee Consumer Protection Act.

On March 2, 2009, Appell[ees] filed a motion to alter or amend the judgment. On July 17, 2009, Defendants Gail

_____

[9] SecurAmerica asserted that Appell[ees] had fraudulently transferred certain assets to their wives in an attempt to shelter those assets from judgment.

10

Schledwitz and Robin Lynch moved for summary judgment on SecurAmerica's fraudulent conveyance claims against them, which had previously been bifurcated and were not yet resolved. On November 20, 2009, the trial court denied Appell[ees]' motion to alter or amend, awarded SecurAmerica $125,000 in attorney's fees against each Appellant, and entered its final amended judgment, which specifically incorporated its earlier findings of fact and conclusions of law from January 30, 2009

On the same day that the trial court entered its final amended judgment, November 20, 2009, it also entered an order granting SecurAmerica a voluntary nonsuit "as to Defendants Karl Schledwitz, Gail Schledwitz, Terry Lynch, and Robin Lynch."

Appell[ees] timely filed their notice of appeal on December 4, 2009. Upon reviewing the appellate record, this Court ascertained that the trial court's orders of November 20, 2009, appeared contradictory. Specifically, it appeared that SecurAmerica had voluntarily nonsuited all of its claims against Appell[ees] on the same day that a final judgment was entered granting relief on certain of those same claims. On January 5, 2011, we entered an order directing the parties to clarify these seemingly incompatible rulings. Oral argument was held on January 25, 2009, and the matter was argued by counsel. Thereafter, on January 28, 2009, SecurAmerica filed a motion styled "Appellee SecurAmerica's Motion Pursuant to Rule 60.01 for Leave to Seek Correction of November 20, 2009 Orders by Trial Court." By order of February 15, 2011, we remanded the matter to the trial court "for the limited purpose of permitting Appellee relief regarding the 'Order Granting Voluntary Nonsuit.' " Following remand, SecurAmerica filed a motion in the trial court seeking correction of the "Order Granting Voluntary Nonsuit." The trial court then entered an order pursuant to Tenn. R. Civ. P. 60.01 styled, "Order Clarifying and Correcting November 20, 2009 Order of Voluntary Nonsuit as to the Fraudulent Conveyance Claims Only." (Emphasis added). Therein, the trial court stated that:

> The Court hereby clarifies the November 20, 2009 Order of Voluntary Nonsuit by stating that said Order dismissed only the fraudulent

conveyance claims, as those were the only claims then pending before the Court. Neither the Plaintiff, SecurAmerica, nor this Court intended to dismiss the entire case by entering the Order of Voluntary Nonsuit.

On March 16, 2011, Appell[ees] filed a second notice of appeal. By order of April 7, 2011, we consolidated Appell[ees]' appeals and directed the parties to file a supplemental brief regarding the trial court's clarifying order.

*SecurAmerica I*, 2011 WL 3808232, at \*3–\*6 (footnotes in original).

A second oral argument in *SecurAmerica I* was held on July 19, 2011. On August 26, 2011, this Court filed its Opinion vacating the judgment of the trial court and remanding for additional/clarified findings, stating:

We have conducted a painstaking review of the record, and of the trial court's judgment, and conclude that judicial review is precluded by incomplete and contradictory findings by the trial court. Specifically, the trial court made incomplete and contradictory findings on the issue of fraud by SecurAmerica. The trial court also neglected to address Appell[ees]' defense that SecurAmerica violated the implied covenant of good faith and fair dealing. . . . [T]hese findings are foundational to appellate review of this case, and without them we cannot adjudicate these issues.

*Id.* at \*10. Specifically, the Court noted that the trial court failed to make sufficient findings with regard to: (1) whether SecurAmerica was liable for the actions of Mr. Reagan;[10] (2) when any allegedly fraudulent activity began; (3) whether the Appellees had proven their fraud claim; and, (4) whether SecurAmerica violated the duty of good faith and fair dealing implicit in its contract with the Appellees.[11] Consequently, this Court vacated the judgment

---

[10]According to *SecurAmerica I*, the trial court determined that SecurAmerica ratified the actions of Mr. Reagan, although this was not a theory of liability that was argued at trial.

[11]Specifically, the *SecurAmerica I* Court noted that the trial court made apparently contradictory findings with regard to fraud, finding that SecurAmerica (through the actions of Mr.

and remanded to the trial court to make appropriate findings of fact and conclusions of law.

On February 1, 2012, SecurAmerica submitted Proposed Findings of Fact and Conclusions of Law to the trial court. On March 6, 2012, the Appellees filed a Motion to Strike SecurAmerica's Proposed Findings of Fact and Conclusions of Law. The Appellees subsequently submitted their own Proposed Findings of Fact and Conclusions of Law on April 11, 2012. The trial court entered an amended judgment on October 12, 2012. In its amended judgment, the trial court essentially reversed its prior decision with regard to liability, finding that a conspiracy and lack of good faith on the part of SecurAmerica released the Appellees from liability pursuant to the guaranties. Specifically, the trial court ruled that Mr. Reagan was acting in the scope of his employment in all his dealings with Southland Transportation, as discussed in more detail *infra*. The trial court then discussed the falsification of the borrowing base certificates and the diversion of funds from the blocked account after the sale of Southland Transportation to Mr. Harrell and Mr. Lucchesi:

> According to Harrell's testimony, he was instructed by Reagan, President of SecurAmerica, in August 2000, to begin falsifying the Borrowing Base Certificates. Harrell stated that he was told by Reagan to "make the figures work." Reagan testified that he was unaware of this practice until December 2000, when he discovered Harrell was falsifying the certificates. However, it is uncontroverted that, for some period of time, both Harrell and Reagan were cooperating in presenting falsified Borrowing Base Certificates to SecurAmerica and on to TransAmerica. Further, SecurAmerica, through Reagan, continued to make advances to Southland Transportation.
>
> In addition to the falsified Borrowing Base Certificates, Harrell testified that, with the full knowledge and, in fact, direction of Reagan, he began diverting accounts receivable remittances around the blocked account. Instead of being used to pay down the line of credit, as required by the terms of the Credit Agreement, this money was diverted to fund the day-to-day operations of Southland Transportation, thus eroding the blocked account remittances used to repay and reduce the loan balance of Southland Transportation to SecurAmerica. As a result, less was paid to SecurAmerica on a monthly basis after

Reagan) had committed fraud, but later finding that there was no reliance on any false misrepresentation, an essential element of any fraud claim. *See Lopez v. Taylor*, 195 S.W.3d 627, 634 (Tenn. Ct. App. 2005).

13

August 2000, and the receivables diminished, which was a deviation from the Credit Agreement.

Reagan testified that SecurAmerica had a lending policy and that he had discretion to make judgments with regard to the lending policy in dealing with the debtors. His actions were not monitored, in any way, nor were they limited in any manner. Reagan further testified that he did not direct Harrell to make false entries on the Borrowing Base Certificates. He stated that "they (Southland Transportation) had submitted Borrowing Base Certificates with false entries," and that the only action he took was to ask Harrell to provide a continuation of that false information to support the loan advances to Southland Transportation until he (Reagan) could fund additional monies to try to rebuild receivables.

As the Court of Appeals noted, the testimony showed that there was a precipitous drop in the "blocked account" receipts from August 2000 through February 14, 2001.

Logically one can believe, as Harrell testified, that the downturn in receipts was when funds began to be diverted to day-to-day operations. This Court finds Harrell's version of events to be more credible in light of the figures presented to the Court. Judging manner and demeanor, the Court finds that Reagan was evasive and defensive in his answers. The Court finds that Reagan's testimony was not credible. Harrell, in this Court's opinion, was the more believable witness.

Reagan and SecurAmerica were both in serious trouble with their lender, TransAmerica. Southland Transportation was not the only loan which was trouble for their creditor, SecurAmerica. Furthermore, SecurAmerica, was in a dangerous position at this point with TransAmerica, after TransAmerica had called their loan. Reagan sanctioned false Borrowing Base Certificates to SecurAmerica, which were then presented upstream to TransAmerica. Reagan testified he made bad decisions, but that he was attempting to save SecurAmerica from losing their funding from TransAmerica. He admitted that he believed that salvaging Southland Transportation would hopefully have prevented Reagan from having to make good on his own personal Guaranty to TransAmerica. TransAmerica had required that SecurAmerica obtain lending from other sources to relieve TransAmerica of their involvement. Reagan was the

14

President of SecurAmerica and the only decision maker within that corporation who dealt with Southland Transportation. The Court finds that Reagan testified sufficiently to show that he was operating on behalf of SecurAmerica, as well as himself. The Court will note that the acts taken were within the scope of his powers, or the powers of the President, since there was no proof to the contrary at trial. No corporate documents were submitted indicating limits upon his power, nor was any oversight alleged. The acts were within the scope of power granted to him under the terms of the Credit Agreement, which was acknowledged by Reagan at trial.

. . . . SecurAmerica argued (through counsel) at trial that Reagan's actions were within the scope of the powers granted to him by the Credit Agreement, as they clearly were. The Court of Appeals noted that SecurAmerica (through counsel) argued on appeal that Reagan was acting outside of the scope of his agency. This Court finds that Reagan had complete authority to act on behalf of SecurAmerica on this loan at all times. It is clear from the proof, primarily the testimony of Reagan, that both Reagan's future and SecurAmerica's future were dependent upon the success of their portfolio of loans. Reagan was cognizant of the fact that if Southland Transportation folded, then his and his company's future were in doubt.

In this Court's opinion, and based upon all of the proof in this matter, Harrell was the more credible witness with regard to the timing of the falsifications. The Court of Appeals correctly pointed out that the collections from the blocked account by SecurAmerica dropped precipitously from August 2000 until February 2001. Both actors, Harrell and Reagan, agreed that Reagan had given permission, or direction, (although with disagreement about the time frame) to divert collections from the blocked account to fund day-to-day operations of the business of Southland Corporation to attempt to keep the doors open and make the company a success. Regardless of the authority granted by the Credit Agreement, it is logical to conclude that the Agreement did not provide for falsifying of loan documents. Reagan and Harrell conspired together to submit false Borrowing Base Certificates and to divert funds, contrary to the Credit Agreement, from the blocked account to the operating account of Southland Transportation, and Harrell

and Lucchesi's subsequent business, Bluff City Transportation. This precipitous drop in repayments coincide with Harrell's testimony concerning the diversion of funds to the day-to-day operating expenses.

Reagan testified that the employees of Southland Transportation had put SecurAmerica in a very difficult position and SecurAmerica was reacting to the damage that had been created by the debtor. Reagan spoke for, acted for, and in fact, was one in the same with SecurAmerica Business Credit, and the Court so finds. Reagan's actions were primarily motivated by an attempt to save his company, SecurAmerica, which would also protect him.

Once again, this Court finds that the actions of Reagan are imputed to SecurAmerica. The business and loan continuation were to the benefit of Reagan and his company, SecurAmerica, so that they could hopefully continue their arrangement and funding with TransAmerica.

Reagan testified that his actions were an effort on his part to try and improve the situation and to get "us" to a position where they were operating on a fully secured basis. This "us" refers, in this context, to Southland Transportation and to SecurAmerica. Reagan, in fact, was responsible for a personal guaranty to TransAmerica for loans provided by that company to SecurAmerica. Reagan's complicity in the falsified Borrowing Base Certificates apparently stems from his belief that continuing to lend capital to Southland Transportation was the best option to prevent the company from failing and defaulting on its loan. At the same time that Southland Transportation was failing, SecurAmerica had several other "problem" loans in its portfolio.

 . . . . After selling Southland Transportation, in August 2000, Schledwitz and Lynch testified they were unaware that money was being loaned based on false Borrowing Base Certificates or that money was being diverted around the blocked account. Schledwitz and Lynch had retained the right to inspect the books and records of Southland Transportation when they sold the business to Harrell and Lucchesi. However, the [Appellees] did not exercise this right and so remained uninformed as to the plight of the trucking company. Schledwitz testified that he frequently saw Reagan during this time but nothing was

16

mentioned about problems with Southland Transportation, except the need to infuse capital on a regular basis. . . .

* * *

In February 2001, Southland Transportation lost their largest customer in Con-Agra, because Southland Transportation did not pay some of their truck drivers. At that point, Harrell and Lucchesi could no longer sustain the business and Southland Transportation closed their doors, thereby defaulting on the loan. David Jackson, a partner at Jackson, Howell and Associates, was hired to audit the books and records of Southland Transportation after the business closed. He was unable to explain much of what he found in the Southland Transportation books and records. He opined that the losses for Southland Transportation were greater than earlier thought. Further, he opined that Southland Transportation had consistently, throughout the loan, overstated their accounts receivables. These statements were contrary to the findings of SecurAmerica's previous auditor, Mr. David Gilcrest, who did field examinations in April and June of 2000, and found sufficient receivables to secure the loan. The Court finds that the auditors who were involved with the business while it was operational had a better grasp of the company's condition than did the auditor who came after the sudden closure of the business, to books that were admittedly in disarray. The Court finds Mr. Gilcrest's June 2000 audit report, as confirmed and adopted by Schledwitz and Reagan, to be more credible. Therefore, this Court finds that the falsification began as Harrell reported in August 2000, after the sale, and unknown to Defendants.

In March of 2001, Reagan revealed the fate of Southland Transportation to SecurAmerica's Board of Directors. After the Board of Directors learned of his actions, he was fired. Since SecurAmerica accelerated the debt ($1,485, 564.25, plus accrued interest according to SecurAmerica's records), Southland Transportation had insufficient assets to satisfy the loan balance. SecurAmerica then sought repayment from Appell[ees] under their personal guarant[ie]s. After learning of the actions of Harrell and Reagan, Appell[ees] declined to honor

17

the guaranty[ie]s.

The trial court then concluded that Mr. Harrell and Mr. Lucchesi entered into a civil conspiracy with SecurAmerica to falsify the borrowing base certificates:

> The Court finds, based upon the proof adduced at trial, that this conspiracy existed, without the knowledge or consent of the Defendants. Schledwitz and Lynch testified that they had no knowledge of the falsified Borrowing Base Certificates until the failure of the business. The Court finds the testimony of Schledwitz and Lynch, in light of all the evidence, to be credible in this regard. Further, Harrell and Reagan, individually and on behalf of SecurAmerica and Southland Transportation, admitted additionally to conspiring to divert the accounts payable from the blocked bank account into the Southland Transportation bank account for the purpose of running the day to day business. Schledwitz and Reagan had numerous conversations and Schledwitz testified that not once did Reagan indicate to him that there was any internal problem with Southland Transportation, other than short-term need for temporary loans. The conclusion of a reasonable mind would be that Reagan kept the falsifying information from Schledwitz purposefully, and in furtherance of the conspiracy.
>
> The Court finds that the fraudulent activity began in August 2000, as testified to by Harrell. However, this Court notes that the date of the conspiracy makes little difference. Once the conspiracy has begun, all conspirators hands are unclean. Not only did Southland Transportation and SecurAmerica agree that there would be falsified Borrowing Base Certificates, they agreed and conspired to divert funds from the blocked account to the account of Southland Transportation, and later Bluff City Transportation, (another company created by Harrell and Luchessi) contrary to the original Credit Agreement, and to the detriment of the Guarantors.

The trial court, however, found that neither party had met their burden to prove fraud:

> The Court finds that Plaintiff, SecurAmerica, has not carried its burden to show fraud perpetrated by Schledwitz and

18

Lynch, nor have Defendants' Schledwitz and Lynch, shown fraud toward them on the part of SecurAmerica or Southland Transportation because of lack of reliance on the acts or misrepresentations of either. The Court finds that both claims for fraud fail.

In contrast, the trial court found that the Appellees had met their burden to show that SecurAmerica breached the duty of good faith and fair dealing implied in all contracts:

This Court finds that the [Appellees'] affirmative defense alleging that SecurAmerica violated the implied covenant of good faith and fair dealing is valid and was shown through testimony of Harrell and Reagan, individually and on behalf of SecurAmerica. Further, the Court finds that the [Appellees'] have proven their case of breach of the duty of good faith and fair dealing against SecurAmerica and Southland Transportation, both under the Common Law and the Tennessee Consumer Protection Act,[12] as well as failure to preserve collateral and thereby significantly increasing the risk of non-payment.

The trial court then concluded that SecurAmerica's participation in the civil conspiracy and violation of the covenant of good faith negated the Appellees' duties pursuant to the guaranties:

Any cause of action alleged by SecurAmerica against Southland Transportation is negated by SecurAmerica's participation in the conspiracy. As testified to at trial, through Reagan, SecurAmerica was aware of, and in fact encouraged, infusion of funds into Southland Transportation by Capital and was aware of the repayment of short term loans from Southland Transportation to Capital, which fell short of the obligations. Therefore, SecurAmerica has not proven a claim against Capital for tortious interference. Further, this Court has found that there was a civil conspiracy on the part of Harrell, Southland Transportation, Reagan and SecurAmerica. Therefore, the Court

_____

[12] Although the trial court found a violation of the Tennessee Consumer Protection Act, the trial court awarded no damages on that basis, finding: "No monetary damages are awarded herein and, therefore, no additional damages are appropriate . . . ."

19

finds that SecurAmerica has not proven breach of contract by Southland Transportation.

From this order, SecurAmerica now appeals.[13]

## II. Issues Presented

SecurAmerica raises the following issues, which are slightly modified from its brief:

1.  Whether the trial court erred in finding SecurAmerica engaged in a civil conspiracy, when the court specifically found an absence of fraud and no other tort was alleged?
2.  Did the trial court err in finding that the alleged conspiracy precluded SecurAmerica from recovery?
3.  Is the sale of Transportation to Mr. Harrell and Mr. Lucchesi a sham sale, such that the Appellees are vicariously liable for Mr. Harrell's acts of which they complain?

---

[13] In our prior Opinion, we noted:

> The parties provided an appellate record that is both excessive and incomplete. The record is at times superfluous ( e.g ., it unnecessarily contains: (1) full transcripts of the trial as well as extensive excerpts; (2) motions and responses irrelevant to the issues on appeal; and (3) trial briefs and discovery papers). At other times it lacks essential information ( e.g., it omits multiple evidentiary exhibits introduced at trial). *See* Tenn. R. App. P. 24(a).

Despite this admonition, the parties do not appear to have made any effort to correct the errors in the record before proceeding with this appeal. The language in Rule 24(a) regarding preparation of the record is not advisory. *See* Tenn. R. App. P. 24(a) (outlining the contents of the record and noting that "all papers relating to discovery, including depositions, interrogatories and answers thereto" should be excluded). We are disappointed by the parties' apparent lack of regard for either the Tennessee Rules of Appellate Procedure or the Opinions of this Court. The record on appeal contains twenty-five volumes of technical record, twenty-one trial transcripts, six full discovery deposition transcripts, several of which exceed two-hundred pages, and eighteen volumes of exhibits, for a total record of over seventy volumes. Had the parties adhered to the rule regarding the exclusion of discovery and duplicate filings, our record would have been more streamlined and the interest of judicial economy would have been better served. We caution litigants that "while in this case we chose to proceed with our review despite the fact that the parties chose not to abide by the rules of this Court, we cannot say we will be so accommodating and choose to do the same in the future." **Wells v. Wells**, No. W2009-01600-COA-R3-CV, 2010 WL 891885, *4 (Tenn. Ct. App. March 15, 2010).

4. Did the Appellees breach the Credit Agreement in transferring Southland Transportation without approval by SecurAmerica?

5. If the transfer of Southland Transportation by the Appellees is accepted by the court as a valid sale, do the Appellees have standing to assert a breach of the credit agreement, since they were no longer parties to the agreement?

6. Under the Appellees' good faith and fair dealing defense and the Tennessee Consumer Protection Act claim, are the sole contracts to be construed the Guaranty Agreements?

7. If under the language of the Guaranty Agreements Appellees agreed to modification of the Credit Agreement terms, impairment of collateral, waiver of fraud, and any other defense, can there be finding of violation of the duty of good faith and fair dealing or the Tennessee Consumer Protection Act against SecurAmerica consistent with the Appellees' agreement?

8. Does the continuing nature, and the absolute and unconditional language of the Guaranty Agreements preclude any defense based on lack of good faith and fair dealing under the common law or Tennessee Consumer Protection Act?

9. Whether the preponderance of the evidence supports that the drop in funds deposited in the blocked account related to a decline in the business of Southland Transportation, rather than a diversion of funds?

10. Whether the Appellees have satisfied their burden of proving a diversion of funds, or more generally, whether they have proven harm or loss of any kind?

11. Can the Appellees' Tennessee Consumer Protection Act claim survive when they failed to prove a violation under the Act, any harm, and failed to avoid injury?

12. Whether Mr. Reagan had authority under the Credit Agreement to loan in excess of 85% of the eligible accounts and to allow Southland Transportation to make deposits in the operating or payroll accounts of Southland Transportation to pay debts of Southland Transportation?

13. Whether the Guaranty Agreements gave Mr. Reagan/SecurAmerica the authority to modify the terms of the Credit Agreement, Appellees consented to same, and waived any right to erosion of the collateral?

14. If Mr. Reagan acted consistent with the terms of the Credit Agreement and/or the Guaranty Agreements, may Appellees recover under any of their causes of action or defenses?

15. Whether SecurAmerica should prevail on its claims against Southland Transportation and the Appellees and judgment entered in its favor, when the undisputed proof is Transportation's loan was in default and the plain language of the governing documents and the evidence shows that Appellees breached the agreements?

16. Whether Southland Transportation breached its Agreements with SecurAmerica and the Appellees breached their Guaranties, such that SecurAmerica is entitled to a judgment against them including an award of attorneys' fees, interest and expenses?

17. Absent proof of knowledge or any affirming act, can SecurAmerica be deemed to have ratified Mr. Reagan's acceptance of false borrowing base certificates from Mr. Harrell?

In the posture of Appellee, the Appellees raise the following issues:

1. Did the trial court err in disallowing the Appellees' claim for fraud against SecurAmerica?

2. Did the trial court find a predicate tort to support its finding that SecurAmerica participated in a conspiracy?

3. Was it proper for the trial court to find that SecurAmerica had violated the duty of good faith and fair dealing?

4. Was it proper for the trial court to find that the Appellees did not breach the Secured Credit Agreement when they sold Southland Transportation and that SecurAmerica had breached that agreement?

5. Was the trial court's finding that SecurAmerica violated the Tennessee Consumer Protection Act proper in light of SecurAmerica's fraudulent conduct and breach of the

22

duty of good faith and fair dealing?

6.     Is the trial court required to find whether ratification occurred before Mr. Reagan's acts can to be imputed to SecurAmerica?

7.     Was it proper for the trial court to release Mr. Schledwitz and Mr. Lynch from their limited guarantees in light of SecurAmerica's conspiracy to wrongfully modify the nature of the loan?

## III. Standard of Review

In non-jury cases, this Court's review is *de novo* upon the record of the proceedings in the trial court, with a presumption of correctness as to the trial court's factual determinations, unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *Union Carbide Corporation v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). The trial court's conclusions of law, however, are afforded no such presumption. *Campbell v. Florida Steel*, 919 S.W.2d 26, 35 (Tenn. 1996).

## IV. Analysis

The trial court's decisions in this case rest first on its findings that the sale of Southland Transportation was a valid transfer, that the sale did not constitute a material breach of the Credit Agreement, and that Mr. Reagan was acting within the scope of his authority and that his actions were, therefore, imputed to SecurAmerica  Accordingly, we begin with the issues concerning the sale of Southland Transportation.

## A. Sham Sale

SecurAmerica first argues that the sale of Southland Transportation was a breach of the Credit Agreement by the Appellees and that it was a sham sale. According to SecurAmerica:

> If it is a sham sale, the [Appellees]  are vicariously liable for the conduct of [Mr.]  Harrell, their employee, a position SecurAmerica has always maintained in this case. *See generally*, *Tucker v. Sierra Builders*, 180 S.W.2d 109, 120 (Tenn. Ct. App. 2005) (An agent acting within the scope of his employment on his principal's business, may hold his principal liable (citations omitted)).

SecurAmerica cites no law supporting its contention that the sale of Southland Transportation was merely a sham. It is well-settled that the failure to cite legal authority in the body of the brief results in a waiver of the issues. *See Hawkins v. Hart*, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001). Further, the trial court made specific findings of fact on this issue, which may not be overturned absent a conclusion that the evidence preponderates against those findings. For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *4215 Harding Road Homeowners Ass'n. v. Harris*, 354 S.W.3d 296, 305 (Tenn. Ct. App. 2011); *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000).

In this case, the trial court made the following, detailed findings:

> The company faced significant cash flow problems. Southland Capital repeatedly infused money into the business. With a struggling business on their hands, Schledwitz and Lynch explored opportunities to sell the trucking operation. Lucchesi and Harrell were interested in purchasing the company, if certain concessions could be made. In August 2000, Schledwitz and Lynch sold Southland Transportation to these two employees. Harrell and Lucchesi did not pay a cash price for their respective interests. Rather, the transaction was structured so that Defendants retained certain debts of Southland Transportation, and Harrell and Lucchesi obligated themselves on a Promissory Note payable to Defendants, Schledwitz and Lynch. Harrell testified that there were certain pieces of equipment that he and Lucchesi did not need or want for their operation, and they expressed this to the sellers. Schledwitz removed those pieces of equipment and continued to pay the notes on those. Lucchesi and Harrell paid approximately ($9,000.00) per month to the former owners for the purpose of paying on the notes on the equipment that they retained.
> According to the testimony of Patricia Cooper, the accountant for Schledwitz and Lynch, confirmed the lengthy negotiations of the parties and testified that this was an arms length transaction.

Thus, the trial court held that the Appellees entered into a valid sale of Southland Transportation. Given SecurAmerica's failure to cite any legal authority for their assertion that this was a sham sale and the presumption of correctness that attaches to the trial court's finding on this issue, we must conclude that the evidence in the record does not preponderate

against the trial court's finding.

## B. Breach of the Credit Agreement by the Appellees

SecurAmerica argues, however, that even if the sale of Southland to Mr. Harrell and Mr. Lucchesi was a valid sale, the sale constituted a breach of the Credit Agreement between SecurAmerica and Southland Transportation. SecurAmerica points to the plain language of the Credit Agreement, which provides:

> **Events of Default.** The occurrence of any one or more of the following events shall constitute an Event of Default:
>
> \* \* \*
>
> (m) **Change in Control.** A Change in Control shall have occurred unless the Lender shall have given its prior written consent.

The trial court agreed that the sale without prior written permission from SecurAmerica "constituted an event of default" under the Credit Agreement, but, apparently, found that SecurAmerica acquiesced in the sale:

> This change in ownership constituted an event of default under the Credit Agreement. However, SecurAmerica did not accelerate the loan, nor did it release Schledwitz and Lynch from their personal guaranties. Rather, after the sale, Reagan/SecurAmerica continued to do business with the new owners by lending money to Southland Transportation under the same Credit Agreement, and [Appellees] remained as guarantors.

In *Crye-Leike, Inc. v. Carver*, No. W2010-01601-COA-R3-CV, 2011 WL 2112768, at * 11 (Tenn. Ct. App. May 26, 2011), this Court defined acquiescence as follows:

> "Acquiescence" has been defined as a conduct from which may be inferred an assent with a consequent estoppel or quasi-estoppel, and also has been described as a quasi-estoppel, or a form of estoppel. An acquiescence to a transaction is a person's tacit or passive acceptance, or an implied consent to an act. Generally, acquiescence as a defense has a dual nature in

25

that, it may on the one hand, rest on the principle of ratification and be denominated an "implied ratification," or, on the other hand, rest on the principle of estoppel and be denominated as "equitable estoppel." The doctrine arises where a person knows or ought to know that he or she is entitled to enforce his or her right to impeach a transaction and neglects to do so for such a time as would imply that he or she intended to waive or abandon his or her right.

*Id.* (quoting 31 C.J.S. Estoppel and Waiver § 178 (2008); citing ***Hinton v. Stephens***, No. W2000-02727-COA-R3-CV, 2001 WL 1176012, at *3 (Tenn. Ct. App. Oct. 4, 2001)).

The evidence in the record clearly supports the trial court's finding that SecurAmerica, through the actions of Mr. Reagan, as discussed *infra*, continued doing business with Southland Transportation after it was informed of the sale of the company. SecurAmerica took no action to declare Southland Transportation in default at that time. Accordingly, the evidence in the record does not preponderate against the trial court's finding that SecurAmerica waived its right to assert that the sale placed the company in default with regard to the Credit Agreement.[14]

## C. Authority

We next consider whether the trial court properly imputed the actions of Mr. Reagan to SecurAmerica. The trial court found that the evidence was uncontroverted that Mr. Reagan participated for some time in the falsification of the borrowing base certificates. The trial court further found that Mr. Reagan's actions were imputed to SecurAmerica through the theory of agency.[15]

---

[14] We note that the Credit Agreement contains a term stating that "no delay, failure or omission of the Lender to exercise any right upon the occurrence of any Default or Event of Default shall impair any such right or shall be construed to be a waiver of any such Default or Event of Default or any acquiescence therein." However, SecurAmerica does not cite this provision in its brief, nor does it set forth any argument that acquiescence was waived under the Credit Agreement. Accordingly, any contention that SecurAmerica did not acquiesce is waived by the failure to properly brief this issue. *See* Tenn. R. App. P. 13(b).

[15] In its brief, SecurAmerica focuses on the issue of ratification. In the trial court's original order, it did hold that SecurAmerica ratified the actions of Mr. Reagan. However, upon reconsideration of this issue, the trial court clearly set aside that ruling in favor of a ruling that Mr. Reagan's actions were imputed to SecurAmerica through the theory of agency. Thus, the question is whether Mr. Reagan is properly considered an agent of SecurAmerica with regard to his actions in this case, and not whether SecurAmerica ratified those actions after the fact.

A basic principle of agency is that a corporation can act only through the authorized acts of its corporate directors, officers, and other employees and agents. Thus, the acts of the corporation's agents are attributed to the corporation itself. "The two are not one and another. So merged are their identities, when the agent is acting for the corporation (the only way it can act at all)[ ], that the one may not be an accessory of the other." *Haverty Furniture Co. v. Foust*, 174 Tenn. 203, 212, 124 S.W.2d 694, 698 (1939) (citations omitted). The scope and extent of an agent's authority are questions of fact that must be determined from all of the facts and circumstances of the particular case. *Southland Express, Inc. v. Scrap Metal Buyers of Tampa, Inc.*, 895 S.W.2d 335, 340 (Tenn. Ct. App.1994). Thus, the trial court's findings on this issue are entitled to a presumption of correctness. With regard to this issue, the trial court specifically found:

> Reagan was one of the creators of SecurAmerica, was the loan officer, as well as a shareholder - recruiting investors and working to bring this investment company into existence. . . . The company, SecurAmerica, had a Board of Directors who had little, if anything, to do with running the day-to-day business of SecurAmerica. Those decisions were vested in Reagan, which he admitted in his trial testimony. Reagan testified that he was specifically allowed to modify the terms of the Credit Agreement at will. No Board of Directors meeting was required nor did there appear to be any oversight. Reagan was, for business dealings purposes, the face of, and in fact and practice, SecurAmerica. Reagan was, according to his testimony, empowered with total responsibility for making decisions for each "Credit Agreement" in the company's portfolio of loans. Reagan's testimony that he could make decisions but had made "bad decisions" does not dilute the fact that he, Reagan, at least with regard to Southland Transportation, acted as, on behalf of and in furtherance of, SecurAmerica. . . . The Court finds that based upon the evidence at trial, Reagan was acting as and for SecurAmerica and any finding against Reagan is a finding against SecurAmerica. All actions of Reagan are imputed to SecurAmerica.

SecurAmerica argues, however, that Mr. Reagan had neither actual, implied, nor apparent authority to participate in the falsification of the borrowing base certificates and the diversion of funds. We respectfully disagree.

27

As stated in 3 C.J.S. Agency § 410 (1973), "[a] principal is bound neither by contracts made by a person not his agent, nor by those of his agent beyond the scope of his actual and apparent authority, which he has not ratified and is not estopped to deny."Agency must be proven by the party seeking to assert it and the "scope and extent of an agent's real and apparent authority" must "be determined . . . from all the facts and circumstances in evidence." *John J. Heirigs Const. Co., Inc. v. Exide*, 709 S.W.2d 604, 608 (Tenn. Ct. App. 1986); *Sloan v. Hall*, 673 S.W.2d 548, 551 (Tenn. Ct. App. 1984). An agency relationship is created only "at the will and by the act of the principal and its existence is a fact to be proved by tracing it to some act of the alleged principal and turns on facts concerning the understanding between the alleged principal and agent." 3 Am.Jur.2d Agency § 15; *see also Thornton v. Allenbrooke Nursing & Rehab. Ctr., LLC*, No. W2007-00950-COA-R3-CV, 2008 WL 2687697, at *5 (Tenn. Ct. App. July 3, 2008). "For an agency relationship to arise, the 'principal must intend the agent to act for him or her, the agent must intend to accept the authority and act on it, and the intention of the parties must find expression either in words or conduct between them.'" *Thornton*, 2008 WL 2687697, at *5 (citing 3 Am.Jur.2d Agency § 15 (2007)).

We begin first with implied authority. Implied authority has been defined as:

> [A]ctual authority given implicitly by the principal to his agent; . . . it is actual authority circumstantially proved, or evidenced by conduct, or inferred from a course of dealing between the alleged principal and the agent. It differs from apparent authority in that it is authority which the principal intended that the agent should have.
>
> * * *
>
> . . . . Implied powers . . . must be bottomed on some act or acquiescence of the principal, express or implied.
>
> . . . their existence or nonexistence in any particular instance being always determinable by reference to the intention of the parties.

2A C.J.S. Agency § 153 (1972). "The term 'implied authority' is typically used to denote actual authority either to do what is necessary to accomplish the agent's express responsibilities, or to act in a manner that the agent reasonably believes the principal wishes the agent to act, in light of the principal's objectives and manifestations." *Barbee v. Kindred Healthcare Operating, Inc.*, No. W2007-00517-COA-R3-CV, 2008 WL 4615858, at *6

28

(Tenn. Ct. App. Oct. 20, 2008) (citing Restatement (Third) of Agency § 2.01 cmt.b.). It has also been described as "authority given implicitly by the principal to his agent; . . . it is actual authority circumstantially proved, or evidenced by conduct, or inferred from a course of dealing between the alleged principal and the agent." *Bells Banking Co. v. Jackson Ctr., Inc.*, 938 S.W.2d 421, 424 (Tenn. Ct. App. 1996). "[Implied authority] differs from apparent authority in that it is authority which the principal intended that the agent should have. . . . Implied powers . . . must be bottomed on some act or acquiescence of the principal, express or implied . . . their existence or nonexistence in any particular instance being always determinable by reference to the intention of the parties." *Bells Banking Co.*, 938 S.W.2d at 424.

Conversely, apparent authority has been described by Tennessee courts as follows:

> (1) such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing;
>
> (2) such authority as he appears to have by reason of the actual authority which he has;
>
> (3) such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess.

*See Barbee*, 2008 WL 4615858, at *6 (citing *Franklin Distrib. Co. v. Crush Intern. (U.S.A.), Inc.*, 726 S.W.2d 926, 930–31 (Tenn. Ct. App. 1986)). In *Barbee v. Kindred Healthcare Operating, Inc.*, this Court went on to note that "a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct has created the apparent authority." *Barbee,* 2008 WL 4615858, at *9 (citing *S. Ry. Co.*, 197 S.W. at 677). Apparent authority is most often defined as:

> Such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing; such authority as he appears to have by reason of the actual authority which he has; such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess.

*Rich Printing Co. v. McKellar's Estate*, 330 S.W.2d 361, 376 (Tenn. Ct. App.1959); see *V.L. Nicholson Co. v. Transcon Inv.*, 595 S.W.2d 474, 483 (Tenn. 1980).

The Appellees argue that Mr. Reagan had both implied and apparent authority to act as the agent of SecurAmerica with regard to its dealings with Southland Transportation. *See* 2 Fletcher Cyc. Corp. § 449 (noting that implied authority is merely actual authority, circumstantially proven). We agree. The evidence in this case shows that SecurAmerica vested Mr. Reagan with nearly unlimited authority and discretion to act as an agent for SecurAmerica. Mr. Reagan was one of only three active employees of SecurAmerica at any given time. SecurAmerica exercised little-to-no supervisory power over Mr. Reagan's decisions regarding the day-to-day activities of the company. Southland Transportation dealt exclusively with Mr. Reagan when contracting with SecurAmerica. As this Court explained:

> [W]here the agent is authorized to transact all the principal's business of a certain kind, or all the acts of a certain class, the very breadth of the employment, the duration of time involved and the variety of the duties to be performed necessarily involve more or less of discretion and choice of methods, and render impracticable, if not impossible, much of particularity or precision, either as to the exact means and method to be employed, or as to the scope or extent of the authority itself. Where so little is expressed, more may well be implied.

*O'Shea v. First Federal Sav. and Loan Ass'n of Columbia*, 22 McCanless 619, 405 S.W.2d 180, 183 (Tenn. 1966) (citing Mechem on Agency §739 (2d ed. 1903)). Here, there is no limit on Mr. Reagan's authority put in place by SecurAmerica. In addition, Mr. Reagan's testimony was undisputed that he engaged in the inflation of the borrowing base certificates not in an effort to defraud SecurAmerica, but to aid Southland Transportation to stay afloat, which in turn, would help SecurAmerica realize the expected return on its investment. These actions were clearly not designed to benefit Mr. Reagan personally. *See* 12 C.J.S. Building & Loan Assoc. § 43 (noting that the president of a lending corporation is not generally acting as an agent of the corporation when the action of the president "is intended to yield a profit to him or her at the expense of, and to the detriment of, the association."). Although Mr. Reagan's actions were allegedly deceptive and unknown to the SecurAmerica Board, that is not sufficient to defeat the trial court's finding that Mr. Reagan had authority to act in this case. As explained in a treatise on the subject:

> The fraud and deceit of the officers and agents of a corporation, performed in the course of their employment, and for the benefit of the corporation, is imputable to the corporation, although it may have been unauthorized. This is true not only when the fraud or deceit is set up by the other party as ground for rescission of a contract [] that party was induced to enter, but

also where it is relied upon as ground for an action of deceit against the corporation. Any deceit practiced by the corporation's officers or agents acting on behalf of the corporation, even though ultra vires, binds the corporation.

10 Fletcher Cyc. Corp. § 4886 (footnotes omitted). Thus, the evidence does not preponderate against the trial court's finding that Mr. Reagan's actions were imputed to SecurAmerica.

### D. Conspiracy

In our prior Opinion, this Court directed the trial court to consider whether either conspiracy or fraud "affect[ed] the liability of the [Appellees]." *SecurAmerica I*, 2011 WL 3808232, at *11. As we explained in *SecurAmerica I*:

> It is well settled in Tennessee that the courts of our State will not be used to enforce a contract which is the product of fraud; indeed, fraud vitiates all that it touches. *Shelby Elec. Co. v. Forbes*, 205 S.W.3d 448, 455 (Tenn. Ct. App. 2005); *see also New York Life Ins. Co. v. Nashville Trust Co.*, 200 Tenn. 513, 292 S.W.2d 749, 754 (1956). Fraud arranged between a creditor and a debtor can thus affect a guarantor's obligation.
>
> * * *
>
> [I]t is apparent that, where a conspiracy or fraud between the debtor and the creditor is alleged, as is the case here, such fraudulent behavior may affect the liability of the guarantor. The ultimate effect, however, is dependent upon a finding of fraud or conspiracy in the first place.

*SecurAmerica I*, 2011 WL 3808232, at *10–*11 (footnote omitted). Thus, only if fraud or a conspiracy is found, will the liability of the guarantors be affected. On remand, the trial court determined that while the Appellees failed to prove fraud, they had proven conspiracy sufficient to avoid their obligations pursuant to the Guaranties. We begin first with SecurAmerica's argument that the trial court erred in finding that SecurAmerica had engaged in a civil conspiracy with Mr. Harrell and Southland Transportation.

This Court discussed the claim for civil conspiracy in *Foster Business Park, LLC v. Winfree*, No. M2006-02340-COA-R3-CV, 2009 WL 113242 (Tenn. Ct. App. Jan. 15, 2009). According to this Court:

31

"An actionable civil conspiracy is a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means, which results in damage to the plaintiff." *Trau-Med of America, Inc.*, 71 S.W.3d at 703; see *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 67 (Tenn.2001) (citing *Dale v. Thomas H. Temple Co.*, 208 S.W.2d 344, 353 (Tenn. 1948)). The elements for civil conspiracy under Tennessee common law, therefore, are: (1) a common design between two or more persons; (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) injury to person or property resulting in attendant damage. *Braswell v. Carothers*, 863 S.W.2d 722, 727 (Tenn. Ct. App. 1993). In addition, civil conspiracy requires an underlying predicate tort allegedly committed pursuant to the conspiracy. *Morgan v. Brush Wellman, Inc.*, 165 F.Supp.2d 704, 721 (E.D. Tenn.2001) (citing *Tenn. Publ'g Co. v. Fitzhugh*, 52 S.W.2d 157, 158 (Tenn.1932)).

Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. *Freeman Mgmt. Corp. v. Shurgard Storage Centers, LLC.*, 461 F.Supp.2d 629, 642–643 (M.D. Tenn. 2006). By participating in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors. *Id.*; *see also Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal. 1994); *Accord. Beck v. Prupis*, 529 U.S. 494, 503 (2000) (noting it was "sometimes said that a conspiracy claim was not an independent cause of action, but was only the mechanism for subjecting co-conspirators to liability when one of their members committed a tortious act").

*Foster Business Park*, 2009 WL 113242, at \*16. Thus, there can be no finding of a civil conspiracy before there is a finding that the participants committed a predicate tort. Two torts were asserted in this case, fraud and a violation of the Tennessee Consumer Protection Act. We begin with fraud.

32

# 1. Fraud

As explained by this Court:

> The essence of fraud is deception. In its most general sense, fraud is a trick or artifice or other use of false information that induces a person to act in a way that he or she would not otherwise have acted. *See **Rawlings v. John Hancock Mut. Life Ins. Co.***, 78 S.W.3d 291, 301 (Tenn. Ct. App. 2001). Fraud occurs when a person intentionally misrepresents a material fact or intentionally produces a false impression in order to mislead another or to obtain an unfair advantage. ***Brown v. Birman Managed Care, Inc.***, 42 S.W.3d 62, 66 (Tenn. 2001). The elements of a claim for fraud include: (1) an intentional misrepresentation of an existing material fact, (2) knowledge of the representation's falsity, and (3) injury caused by reasonable reliance on the misrepresentation. ***Concrete Spaces, Inc. v. Sender***, 2 S.W.3d 901, 904 (Tenn. 1999); ***First Nat'l Bank v. Brooks Farms***, 821 S.W.2d 925, 927 (Tenn. 1991); ***Metropolitan Gov't v. McKinney***, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992).

***Lopez v. Taylor***, 195 S.W.3d 627, 634 (Tenn. Ct. App. 2005). The trial court found that the Appellees had failed to prove fraud because the Appellees could show no reliance on the misrepresentations. Appellees assert that this was error and contend that Southland and SecurAmerica committed fraud by falsifying the borrowing base certificates and diverting funds from the blocked accounts. SecurAmerica contends, however, that the evidence does not preponderate against the trial court's finding that the Appellees' lack of justified reliance defeats their fraud claim.

As previously explained, reliance is an essential element of fraud in Tennessee. *See **Lopez***, 195 S.W.3d at 634. The existence of reasonable or justified reliance is a question of fact that is entitled to a presumption of correctness on appeal. *See **Island Brook Homeowners Ass'n, Inc. v. Aughenbaugh***, 2007 WL 2917781, at *7 (Tenn. Ct. App. October 5, 2007) (citing Am.Jur.2d <u>Fraud and Deceit</u> § 502 (2001)). As recently explained by the Tennessee Supreme Court:

> Whether a person's reliance on a representation is reasonable generally is a question of fact requiring the consideration of a number of factors. *E.g.,* ***City State Bank v. Dean Witter***

> ***Reynolds***, Inc., 948 S.W.2d 729, 737 (Tenn. Ct. App. 1996).
> The factors include the plaintiff's sophistication and expertise
> in the subject matter of the representation, the type of
> relationship—fiduciary or otherwise—between the parties, the
> availability of relevant information about the representation, any
> concealment of the misrepresentation, any opportunity to
> discover the misrepresentation, which party initiated the
> transaction, and the specificity of the misrepresentation. *See,
> e.g., **id.**; accord **Allied Sound, Inc. v. Neely**,* 58 S.W.3d 119,
> 122–23 (Tenn. Ct. App. 2001).

***Davis v. McGuigan***, 325 S.W.3d 149, 158 (Tenn. 2010).

The Appellees had the burden of proving fraud in order to affect their liability pursuant to the Guaranties:

> The party alleging fraud has the burden to prove the element of
> reliance. Thus, a party who alleges that he or she was defrauded
> through a false representation has the burden of proof to
> establish that he or she did rely upon it, that he or she acted in
> reliance upon it to his or her injury, and that the reliance was
> justified or reasonable. It also has been held that the party
> alleging fraud must show that he or she would not have acted as
> he or she did but for reliance on the misrepresentation.

37 Am. Jur. 2d Fraud and Deceit § 465 (footnotes omitted). As further explained:

> Reliance on a fraudulent misrepresentation, for purposes of
> establishing a fraud claim, is established by showing that the
> defendant's actions and representations induced the plaintiff to
> act or to refrain from action. In other words, the reliance element
> of a fraud claim requires that the misrepresentation actually
> induced the injured party to change its course of action.

37 C.J.S. Fraud § 51 (footnotes omitted).

There are no allegations in the Appellees' brief that Southland and SecurAmerica made a direct misrepresentation of material fact to them. Instead, the Appellees assert that Southland and SecurAmerica concealed facts from the Appellees regarding the collateralization of the loan. The misrepresentation in the case, thus, concerns concealment,

rather than an affirmative misrepresentation:

> [W]here redress is sought for fraudulent concealment or suppression, it must appear that the plaintiff relied on the defendant to make a disclosure of the fact, and that the concealment or suppression was a moving inducement to the plaintiff's change of position. A plaintiff may establish the actual reliance element of an intentional concealment claim by showing that had the omitted information been disclosed, he or she would have been aware of it and would have behaved differently.
>
> There can be no redress for representations which do not influence the complainant . . . .

37 C.J.S. Fraud § 51 (footnotes omitted). Further, reliance will usually not be found when the complainant has an equal opportunity to perform its own investigation of the facts: "As a general rule, where the parties deal on equal terms, one who has failed to avail himself or herself of the means of knowledge readily within his or her reach cannot complain of the other party's representations. . . ." 37 C.J.S. Fraud § 56. However, "[t]he fact that a party failed to avail himself or herself of a means of knowledge does not bar a redress for fraud where the speaker used an artifice or misrepresentation to prevent him or her from investigating and learning the truth." 37 C.J.S. Fraud § 58. Further, "[o]ne has no right to rely on representations unless they were directly or indirectly made to him or her." 37 C.J.S. Fraud § 60.

The Appellees cite no law to support their contention that the trial court erred in failing to find reliance in this case. "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her . . . ." *Sneed v. Bd. of Prof' Responsibility of Sup.Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010). Additionally, this Court's review is appellate only. *See* Tenn. R. App. P. 13(b) (noting that appellate review "generally will extend only to those issues presented for review."). We are directed only to consider those issues that are properly raised, argued, and supported with relevant authority. *See Hawkins v. Hart*, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001) ("In order for an issue to be considered on appeal, a party must, in his brief, develop the theories or contain authority to support the averred position . . . .").

Considering the totality of the circumstances, including the Appellees' failure to properly brief this issue, we affirm the decision of the trial court that no reliance was proven in this case. Nothing in the record shows that the Appellees changed their behavior due to the alleged fraudulent activity in this case. *See* 37 Am. Jur. 2d Fraud and Deceit § 465**.** The Appellees in this case are undisputedly sophisticated business persons, regarding both business in general and this particular business operation. *McGuigan*, 325 S.W.3d at 158. The

35

Appellees do not argue in their brief that the Guaranty agreements created a fiduciary relationship between SecurAmerica and the Appellees. *Id.*; *see Foster Business Park*, 2009 WL 113242, at \*13 (holding that "the dealings between a lender and borrower are not inherently fiduciary absent special facts and circumstances") (quoting *Oak Ridge Precision Industries, Inc. v. First Tennessee Bank Nat. Ass'n*, 835 S.W.2d 25, 30 (Tenn. Ct. App. 1992)); 1 Lender Liability: Law, Prac. & Prevention § 5:3 (noting that "the relationship between a lender and any guarantors of the borrower's loan" "does not, in and of itself, establish a fiduciary relationship"). Further, the trial court found that the Appellees themselves retained a right to inspect the records of Southland after the sale to Mr. Harrell and Mr. Lucchesi, but chose not to exercise that right, instead choosing to remain "uninformed as to the plight of" Southland Transportation. The evidence in the record does not preponderate against this finding. Thus, information regarding the finances of Southland Transportation was available to the Appellees and they had the opportunity to discover the falsified documents. *McGuigan*, 325 S.W.3d at 158; *see also* 37 C.J.S. Fraud § 56 (noting that reliance will usually not be found to be justifiable when the complainant had the opportunity to learn of the deceit). Under these circumstances, the evidence in the record does not preponderate against the trial court's finding that the Appellees failed to prove justifiable reliance. Without justifiable reliance, there can be no fraud.

## 2. Tennessee Consumer Protection Act

The Appellees argue that despite the trial court's finding that fraud was not proven, the trial court correctly concluded that Southland Transportation and SecurAmerica participated in civil conspiracy because the trial court concluded that they had violated the Tennessee Consumer Protection Act ("TCPA").

The TCPA was enacted to provide statutory remedies beyond common-law fraud actions for consumers and legitimate business enterprises victimized by unfair or deceptive business acts or practices that were committed in Tennessee in whole or in part. *See* Tenn. Code Ann. § 47-18-102; *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005). The TCPA applies to any "act or practice which is unfair or deceptive to the consumer or to any other person." Tenn. Code Ann. § 47-18-104(b)(27).[16] The TCPA's provisions, however, are limited to those actions "affecting the conduct of any trade or commerce." Tenn.

---

[16] The provision at issue of the TCPA was recently amended to limit its application in private suits such as the one in this case. *See* 2011 Pub.Acts, c. 510, §§ 15, 19. Accordingly, on all suits accruing on or after October 1, 2011, only the Attorney General is vested with the authority to prosecute general violations of the TCPA under the provision regarding "any other act or practice which is deceptive to the consumer or to any other person." *Id.* Because this suit was commenced in 2001, the prior version of the statute containing no limitation on enforcement of this provision is applicable to this case.

Code Ann. § 47-18-104(a), (b); *see also **Pursell v. First American Nat. Bank***, 937 S.W.2d 838, (Tenn. 1996) (limiting violations of the TCPA to conduct affecting trade or commerce). A "deceptive" act or practice is "one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as a matter of fact." ***Tucker***, 180 S.W.3d at 116 (citations omitted). An act or practice may be deemed unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." *Id.* at 116–17 (citing 15 U.S.C. § 45(n)). Because the TCPA is remedial, courts have determined that it should be construed liberally in order to protect the consumer. ***Tucker***, 180 S.W.3d at 115. In order to recover under the TCPA, a plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act; and (2) that the defendant's conduct caused an "ascertainable loss of money or property. . . ." ***Tucker***, 180 S.W.3d at 116 (quoting Tenn. Code Ann. § 47-18-109(a)(1)); *see also **Cloud Nine, L.L.C. v. Whaley***, 650 F.Supp.2d 789, 798 (E.D. Tenn. 2009) ("plaintiffs asserting claims under the [TCPA] are required to show that the defendant's wrongful conduct proximately caused their injury").

The TCPA does not define the key terms "unfair" and "deceptive," making the determination of whether a particular act or practice is unfair or deceptive a legal matter to be decided by the court. *See **Tucker***, 180 S.W.3d at 116. However, whether a specific representation in a particular case is "unfair" or "deceptive" is a question of fact. ***Audio Visual Artistry v. Tanzer***, 403 S.W.3d 789, 810 (Tenn. Ct. App. 2012). The General Assembly has instructed us to look to the federal understanding of these terms in interpreting them in the TCPA. *See* Tenn. Code Ann. § 47-18-115. "A deceptive act or practice is one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact." ***Tucker***, 180 S.W.3d at 116; *see* Jonathan Sheldon & Carolyn L. Carter, Unfair and Deceptive Acts and Practices § 4.2.3.1, at 118–19 (5th ed. 2001). The concept of unfairness is broader than the concept of deceptiveness and "it applies to various abusive business practices that are not necessarily deceptive." ***Tucker***, 180 S.W.3d at 116; see Unfair and Deceptive Acts and Practices § 4.2.3.1, at 156. "An act or practice should not be deemed unfair 'unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.'" ***Tucker***, 180 S.W.3d at 116 (citing 15 U.S.C.A. § 45(n)). In addition, the Appellees' claim pursuant to the TCPA does not fail for lack of reliance, as this Court has held that reliance is not an essential element of a TCPA claim. *See **Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.***, 131 S.W.3d 457, 469 (Tenn. Ct. App. 2003) (holding that "in TCPA cases involving misrepresentation, a plaintiff is not required to show reliance upon a misrepresentation in order to maintain a cause of action").

The trial court in this case made little to no findings with regard to its ruling that

Southland Transportation and SecurAmerica violated the TCPA. First, we note that the trial court made no finding that a violation of the TCPA could serve as an underlying tort for a civil conspiracy claim. *See Hagan v. Phipps*, No. M2010-00002-COA-R3-CV, 2010 WL 3852310, at \*5, n.7 (Tenn. Ct. App. Sept. 28, 2010) (noting, in *dicta*, that TCPA claims may constitute a predicate tort for purposes of civil conspiracy because "claims under the TCPA have been characterized as tort actions"). The trial court also failed to make any findings as to whether the sophisticated commercial guarantors in this case are properly considered "consumers" protected by the TCPA. *See* Tenn. Code Ann. § 47-18-103 (defining "consumer" for purposes of the TCPA as "any natural person who seeks or acquires by purchase, rent, lease, assignment, award by chance, or other disposition, any goods, services, or property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated"). The trial court also failed to make specific findings as to whether the Appellees suffered an "ascertainable loss of money or property" as a result of the alleged violation of the TCPA. *See Tucker*, 180 S.W.3d at 115. Additionally, the trial court failed to make any finding as to whether the conduct of Southland Transportation and SecurAmerica in this case was either deceptive or unfair. The facts in this case, as found by the trial court, make this distinction critical to the resolution of this issue. If the acts of Southland Transportation and SecurAmerica were merely unfair, rather than deceptive, the injury caused by those acts must not be "reasonably avoidable by [the Appellees]." *Tucker*, 180 S.W.3d at 116. Here, the trial court found that the Appellees voluntarily chose to remain uninformed as to the plight of Southland Transportation, even though the Appellees retained a right to inspect the records of the company. This tends to suggest that the trial court would have found that the injury in this case could have been reasonably avoided by the Appellees. However, the trial court failed to address this issue. Thus, the question of whether the conduct of Southland Transportation and SecurAmerica meet the higher standard of deception is critical to the resolution of this issue. Finally, the trial court failed to make any findings as to whether the allegedly unfair or deceptive acts at issue in this case "affect[] trade or commerce." *Pursell*, 937 S.W.2d at 841 (holding that "[t]he terms 'trade or commerce' are specifically defined to limit the Act's application"); *see* Tenn. Code Ann. § 47-18-103(defining trade or commerce as "the advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things of value wherever situated"). Without these findings, this Court may only speculate as to how the trial court reached its decision. *See In re K.H.*, 2009 WL 1362314, at \*8 (quoting *In re M.E. W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at \*19 (Tenn. Ct. App. April 21, 2004) ("Without such findings and conclusions, this court is left to wonder on what basis the court reached its ultimate decision.")).

We fully recognize that this is the second appeal of this case, which has been pending for over a decade. In addition, the first appeal was remanded to the trial court for additional findings of fact and conclusions of law. Remanding to the trial court at this juncture would

again delay a final resolution of the issues in this case.  However, the General Assembly's decision to require findings of fact and conclusions of law in bench trials such as this case, is "not a mere technicality." *In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *8 (Tenn. Ct. App. May 15, 2009). Without findings of fact, we cannot discern the basis for the trial court's decision, "and we are unable to afford appropriate deference to the trial court's decision." *In re Connor S.L.*, No. W2012-00587-COA-R3-JV, 2012 WL 5462839, at *4 (Tenn. Ct. App. Nov.8, 2012). Generally, the appropriate remedy when a trial court fails to make appropriate findings of fact and conclusions of law is to "vacate the trial court's judgment and remand the cause to the trial court for written findings of fact and conclusions of law." *Lake v. Haynes*, No. W2010-00294-COA-R3-CV, 2011 WL 2361563, at *1 (Tenn. Ct. App. June 9, 2011). However, this Court has indicated that we may "soldier on" with our review despite the trial court's failure to make sufficient findings of fact and conclusions of law, in certain limited circumstances:

> On occasion, when a trial judge fails to make findings of fact and conclusions of law, the appellate court "may 'soldier on' when the case involves only a clear legal issue, or when the court's decision is 'readily ascertainable.' " *Hanson v. J.C. Hobbs Co., Inc.*, No. W2011-02523-COA-R3-CV, 2012 WL 5873582, at *10 (Tenn. Ct. App. Nov. 21, 2012) (quoting *Simpson v. Fowler*, No. W2011-02112-COA-R3-CV, 2012 WL 3675321, at *4 (Tenn. Ct. App. Aug. 28, 2012)).

*Pandey v. Shrivastava*, No. W2012-00059-COA-R3-CV, 2013 WL 657799, at *5 (Tenn. Ct. App. Feb. 22, 2013).  As previously discussed, whether an act was unfair or deceptive is an issue of fact, rather than a clear legal issue. *See Tanzer*, 403 S.W.3d at  810.  In this case, the trial court's ruling with regard to the TCPA contains no findings as to the essential elements of that claim or the facts that support the trial court's ruling with regard to this issue. As such, the trial court's ruling is not "readily ascertainable." *Id.* The trial court apparently based its decision that SecurAmerica and Southland Transportation engaged in a civil conspiracy on its finding that the two companies had committed a violation of the TCPA. However, without findings to support its ruling with regard to the predicate tort, we are unable to affirm the trial court's ruling with regard to the civil conspiracy. Accordingly, we must vacate the judgment of the trial court on these issues and remand for further findings of fact and conclusions of law.

### E. Duty of Good Faith and Fair Dealing

In addition to its finding with regard to conspiracy, the trial court also ruled that SecurAmerica had violated the duty of good faith and fair dealing implied in the Guaranties.

39

As explained in our *SecurAmerica I*:

> A guaranty is a contract and is to be construed according to the ordinary meaning of the language used and with the view to carry out the intent of the parties. *First Nat'l Bank v. Foster*, 451 S.W.2d 434, 436 (Tenn. Ct. App. 1969). Guaranties are considered special contracts under Tennessee law. *SunTrust Bank v. Dorrough*, 59 S.W.3d 153, 156 (Tenn. Ct. App. 2001). Guarantors are disfavored in Tennessee, and we will construe a guaranty against the guarantor as strongly as the language will permit. *Id.* (citing *Squibb v. Smith*, 948 S.W.2d 752, 755 (Tenn. Ct. App.1997); *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)).

*SecurAmerica I*, 2011 WL 3808232, at *9.

It is well-settled in Tennessee that "'the common law imposes a duty of good faith in the performance of contracts.'" *Dick Broadcasting Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 660 (Tenn. Jan. 17, 2013) (quoting *Wallace v. Nat'l Bank of Commerce*, 938 S .W.2d 684, 686 (Tenn. 1996)). Our Supreme Court has reiterated that "'[i]t is true that there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement, and a person is presumed to know the law.'" *Dick Broadcasting*, 395 S.W.3d at 660 (citations omitted). The duty of good faith, however, does not extend beyond the terms of the contract and the reasonable expectations of the parties under the contract. *Id.* at *9. The obligation of good faith and fair dealing does not create additional contractual rights or obligations, and it cannot be used to avoid or alter the terms of an agreement. *Id.*

The duty of good faith is not specifically defined by our courts. As explained in the <u>Tennessee Practice Series</u>:

> The term "good faith" resists an exact definition . . . because it arises in various contexts and its meaning will vary accordingly. Indeed, "good faith" is "a term frequently defined in the negative," i.e., it represents the absence of bad faith. Another authority makes these helpful observations about the "good faith" concept:
>
>> [G]ood faith is an "excluder." It is a phrase without general meaning (or meanings) of its own and serves to exclude a wide range of

40

heterogeneous forms of bad faith. In a particular context the phrase takes on specific meaning, but usually this is only by way of contrast with the specific form of bad faith actually or hypothetically ruled out.

Notwithstanding this uncertainty over the exact nature of "good faith," parties are presumed to know the law and that the contract contains this implied duty.

The implied covenant of good faith and fair dealing is not limited to the specific contract terms but is a method of effectuating the parties' intent in unforeseen circumstances. Further, a party may violate the covenant when it interprets the contract purposely in a way to prevent the other party from performing in a timely fashion or when a party conjures up a pretended dispute with its interpretation.

21 <u>Tenn. Prac. Contract Law and Practice</u> § 8:33 (footnotes omitted). The Tennessee Court of Appeals, in **Winfree v. Educators Credit Union**, 900 S.W.2d 285 (Tenn. Ct. App. 1995), relied on American Jurisprudence, Second Edition, on Contracts, to define the parameters of the duty of good faith. According to **Winfree**:

[T]here is an implied undertaking in every contract on the part of each party that he will not intentionally or purposely do anything . . . which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Ordinarily if one exacts a promise from another to perform an act, the law implies a counterpromise against arbitrary or unreasonable conduct on the part of the promisee. However, essential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing.

**Winfree**, 900 S.W.2d at 289 (quoting 7 Am.Jur.2d Contracts § 256 (1964) (footnotes omitted)). While the above quote seems to suggest that intentional or purposeful conduct is required to breach the duty of good faith, other Tennessee Courts have noted that mere "inaction" may suffice to breach the implied duty. *See, e.g.,* **Vraney v. Medical Specialty Clinic, P.C.**, 2013 WL 4806902, at *31 (Tenn. Ct. App. Sept. 9, 2013) ("'[B]ad faith may be overt or may consist of inaction, and fair dealing may require more than honesty,' and bad faith can include 'failure to cooperate in the other party's performance.'") (citing Restatement (Second) of Contracts § 205 cmt.d (1981)). Tennessee Supreme Court Justice William C.

Koch, however, has cautioned against a broad definition of good faith in circumstances involving arms-length commercial transactions, like the one in this case:

> The courts should tread cautiously when asked to recognize and enforce implied obligations that are not reflected in a written contract. The freedom to contract is "a vital aspect of personal liberty" [quoting Steven W. Feldman, <u>Tennessee Practice: Contract Law and Practice</u> § 7:1, at 728 (2006) (hereinafter, "Feldman, Contract Law and Practice")] that ensures the right of competent persons to enter into contracts or to decline to do so, as long as the contract is not illegal or against public policy. ***ARC LifeMed, Inc. v. AMC-Tennessee***, Inc., 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (quoting ***McCall v. Carlson***, 63 Nev. 390, 172 P.2d 171, 187 (1946)). It also ensures that contracting parties have "the right and power to construct their own bargains." ***Planters Gin Co. v. Federal Compress & Warehouse Co.***, 78 S.W.3d 885, 892 (Tenn.2002) (quoting Blake D. Morant, *Contracts Limiting Liability: A Paradox with Tacit Solutions*, 69 Tul. L.Rev. 715, 716 (1995)).

> The courts should "not lightly . . . interfere with [the] freedom of contract." ***McKay v. Louisville & Nashville R.R.***, 133 Tenn. 590, 600, 182 S.W. 874, 876 (1916) (quoting ***Baltimore & Ohio Sw. Ry. v. Voigt***, 176 U.S. 498, 506, 20 S.Ct. 385, 44 L.Ed. 560 (1900)). "In an arm's length [commercial] transaction, the parties' freedom to contract is an important right that must be jealously guarded . . . from unnecessary intervention by the courts." ***Potomac Leasing Co. v. Chuck's Pub, Inc.***, 156 Ill.App.3d 755, 109 Ill.Dec. 90, 509 N.E.2d 751, 754 (1987); *see also* 21 Feldman, <u>Contract Law and Practice</u> § 8:4, at 861; Friedrich Kessler & Edith Fine, *Culpa in Contrahendo, Bargaining in Good Faith, and Freedom of Contract: A Comparative Study*, 77 Harv. L.Rev. 401, 449 (1964). Accordingly, the courts should decline "to make a new contract for parties who have spoken for themselves." ***Smithart v. John Hancock Mut. Life Ins. Co.***, 167 Tenn. 513, 525, 71 S.W.2d 1059, 1063 (1934). In the absence of fraud or mistake, the courts should construe unambiguous written contracts as they find them. ***Ellis v. Pauline S. Sprouse Residuary Trust***, 280 S.W.3d 806, 814 (Tenn.2009).

> Questions involving the scope and application of the implied duty of good faith and fair dealing are far from settled. . . . [T]he implied duty of good faith and fair dealing and fiduciary duty are "variations on a theme" in that "[b]oth are judicially imposed loyalty obligations designed to attack the

potential for opportunism in relationships."[D. Gordon Smith, *The Critical Resource Theory of Fiduciary Duty*, 55 Vand. L.Rev. 1399, 1489, 1487–88 (2002).] However, absent extraordinary circumstances, parties dealing at arm's length in a commercial transaction lack the sort of relationship of trust and confidence that gives rise to a fiduciary relationship. ***Henneberry v. Sumitomo Corp. of Am.***, 415 F.Supp.2d 423, 441 (S.D.N.Y.2006) (quoting ***National Westminster Bank, U.S.A. v. Ross***, 130 B.R. 656, 679 (S.D.N.Y.1991)); ***EBC I, Inc. v. Goldman Sachs & Co.***, 5 N.Y.3d 11, 799 N.Y.S.2d 170, 832 N.E.2d 26, 31 (2005); *see also* ***Cude v. Couch***, 588 S.W.2d 554, 557–58 (Tenn.1979) (Henry, J., dissenting) (quoting ***Meinhard v. Salmon***, 249 N.Y. 458, 164 N.E. 545, 546 (1928) (stating that "[m]any forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties")). Accordingly, the implied duty of good faith and fair dealing, in the context of commercial transactions, is "weaker" than the duty owed by fiduciaries because it "qualifies rather than negates the assumption of selfishness that applies to a contract." Smith, 55 Vand. L.Rev. at 1488–89 & n.382.

The conduct of sophisticated parties engaged in commercial transactions is dictated by the "impersonal laws of the marketplace" [quoting ***Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.***, 182 N.J. 210, 864 A.2d 387, 389 (2005),] and the demands of "practical business exigency." [quoting ***Marietta Fertilizer Co. v. Beckwith***, 61 S.E. at 150.] Parties engaged in a commercial transaction pursue their own self-interest and understand and expect that the parties with whom they are dealing are doing likewise. *See* ***Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.***, 864 A.2d at 389; ***Strongsville Bd. of Educ. v. Cuyahoga Cnty. Bd. of Revision***, 112 Ohio St.3d 309, 2007-Ohio-6, 859 N.E.2d 540, at ¶ 13; 3 Dan B. Dobbs et al., The Law of Torts § 697 (2d ed.2011); Agasha Mugasha, *Evolving Standards of Conduct (Fiduciary Duty, Good Faith and Reasonableness) and Commercial Certainty in Multi–Lender Contracts*, 45 Wayne L.Rev. 1789, 1824 (2000); Tory A. Weigand, *The Duty of Good Faith and Fair Dealing in Commercial Contracts in Massachusetts*, 88 Mass. L.Rev. 174, 184 (2004).

The courts should be cautious about imposing a set of

morals on the commercial marketplace. See ***Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.***, 864 A.2d at 399. Care must be taken to avoid overly broad applications of the implied duty of good faith and fair dealing that could "frustrate the policy interest in freedom of contract and undermine the parties' legitimate efforts to contractually determine their obligations." Sandra K. Miller, *Legal Realism, the LLC, and a Balanced Approach to the Implied Covenant of Good Faith and Fair Dealing*, 45 Wake Forest L.Rev. 729, 740 (2010). . . .

\* \* \*

The scope of claims for breach of the implied duty of good faith and fair dealing should be defined in a way that avoids overly broad claims that could undermine the freedom of commercial parties to contract as they see fit. In this context, "good faith is best understood as the absence of bad faith." Smith, 55 Vand. L.Rev. at 1489; *see* ***Landry v. Spitz***, 102 Conn.App. 34, 925 A.2d 334, 342 (2007); ***Continental Ins. Co. v. Rutledge & Co.***, 750 A.2d 1219, 1234 (Del. Ch. 2000). Construing the Uniform Commercial Code's "obligation of good faith," the Court of Appeals noted that "[g]ood faith imposes 'an honest intention to abstain from taking any unconscientious advantage of another, even through the forms and technicalities of the law.' " ***Huntington Nat'l Bank v. Hooker***, 840 S.W.2d 916, 926 (Tenn. Ct. App. 1991) (quoting ***Lane v. John Deere Co.***, 767 S.W.2d 138, 140 (Tenn.1989)).

Bad faith has been defined in various ways. This Court has construed "bad faith" as "actions in knowing or reckless disregard of . . . contractual rights." ***Glazer v. First Am. Nat'l Bank***, 930 S.W.2d 546, 549–50 (Tenn. 1996). Several courts, addressing the scope of breach of the implied duty of good faith and fair dealing claims have held that a showing of "bad motive or intention" is a necessary element of the claim. ***Kolbe v. BAC Home Loans Servicing, LP***, 695 F.3d 111, 123 (1st Cir. 2012) (quoting ***Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.***, 864 A.2d at 396); ***Targus Grp. Int'l, Inc. v. Sherman***, 76 Mass.App.Ct. 421, 922 N.E.2d 841, 853 (2010) (citation omitted) (stating that bad faith conduct implicates "a

44

dishonest purpose, consciousness of wrong, or ill will in the nature of fraud"); *Limbert v. Mississippi Univ. for Women Alumnae Ass'n*, 998 So.2d 993, 998 (Miss.2008) (citation omitted) (stating that " 'bad faith' implies some conscious wrongdoing 'because of dishonest purpose or moral obliquity' ").

Thus, in this context, "bad faith" is not simply bad judgment or negligence. *Borzillo v. Borzillo*, 259 N.J.Super. 286, 612 A.2d 958, 961 (Ch. Div.1992). It involves a dishonest purpose. *Landry v. Spitz*, 925 A.2d at 342. In general, "[b]ad faith . . . implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Keller v. Beckenstein*, 117 Conn.App. 550, 979 A.2d 1055, 1063–64 (2009). The Supreme Court of Montana has likewise held that the implied duty of good faith and fair dealing is breached "[w]hen one party uses discretion conferred by the contract to act [dishonestly] or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract." *Marshall v. State*, 253 Mont. 23, 830 P.2d 1250, 1251 (1992).

*Dick Broadcasting Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 673–75 (Tenn. Jan. 17, 2013) (Koch, J., concurring).

As discussed above, the duty of good faith is based on the reasonable expectations of the parties based on the terms of the contract. Accordingly, before the trial court could have found a violation of the duty of good faith, the trial court must have first determined what constituted the agreement between the parties, including which documents were to be considered. Accordingly, we begin with that question.

## 1. The Parties' Agreement

The trial court made no express findings as to the parties' reasonable expectations in this case, nor did the trial court make any findings as to which documents in the record represented the agreement of the parties. The interpretation of a contract is a question of law. *Guiliano v. CLEO, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). Therefore, the trial court's interpretation of a contractual document is not entitled to a presumption of correctness on appeal. *Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). The Tennessee Supreme Court discussed the court's role in interpreting contracts in *Maggart v.*

*Almany Realtors, Inc.*, 259 S.W.3d 700 (Tenn. 2008), stating:

> "The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles." ***Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.***, 521 S.W.2d 578, 580 (Tenn. 1975); *see also* ***Christenberry*** [***v. Tipton***], 160 S.W.3d [487,] 494 [(Tenn. 2005)]. If the language of the contract is clear and unambiguous, the literal meaning controls the outcome of the dispute. ***Planters Gin Co. v. Fed. Compress & Warehouse Co.***, 78 S.W.3d 885, 890 (Tenn. 2002). In such a case, the contract is interpreted according to its plain terms as written, and the language used is taken in its "plain, ordinary, and popular sense." ***Bob Pearsall Motors, Inc.***, 521 S.W.2d at 580; ***Planters Gin Co.***, 78 S.W.3d at 890. The interpretation should be one that gives reasonable meaning to all of the provisions of the agreement, without rendering portions of it neutralized or without effect. *See **Davidson v. Davidson***, 916 S.W.2d 918 922–23 (Tenn. Ct. App. 1995). The entire written agreement must be considered. ***D. & E. Const. Co. v. Robert J. Denley Co.***, 38 S.W.3d 513, 518–19 (Tenn. 2001).
>
> > In construing a contract, the entire contract should be considered in determining the meaning of any or all of its parts. It is the universal rule that a contract must be viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illuminate another.
>
> ***Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.***, 690 S.W.2d 231, 237 (Tenn.1985) (internal citations omitted).

*Maggart*, 259 S.W.3d at 703–04.

The Appellees, in their brief, argue that the parties intended the loan from SecurAmerica to Southland Transportation to be, at all times, secured by appropriate collateral, as evidenced by unfalsified borrowing base certificates. To support this contention, the Appellees argue that the terms of the Guaranties and the Credit Agreement must be construed as a whole. As explained by the Tennessee Supreme Court:

> Other writings, or matters contained therein, which are referred to in a written contract may be regarded as incorporated by reference as a part of the contract and therefore, may be properly considered in the construction of the contract. Where a written contract refers to another instrument and makes the terms and conditions of such other instrument a part of it, the two will be construed together as the agreement of the parties.
>
> Construing contemporaneous instruments together means simply that if there are any provisions in one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect as between the parties themselves And all persons charged with notice so that the intent of the parties may be carried out and the whole agreement actually made may be effectuated.

*McCall v. Towne Square, Inc*., 503 S.W.2d 180, 183 (Tenn. 1973) (quoting 17 Am.Jur.2d, <u>Contracts</u> §§ 263–65); *see also* 11 <u>Williston on Contracts</u> § 30:25 (4th ed.) ("Generally, all writings which are part of the same transaction are interpreted together.").

SecurAmerica, in contrast, argues that because the Appellees are no longer parties to the Credit Agreement by virtue of the sale of Southland Transportation, the trial court may only consider the Guaranty agreements in determining whether SecurAmerica breached the duty of good faith. Because the trial court did not find a violation of any specific duty pursuant to the Guaranties, SecurAmerica argues that the trial court erred in finding a violation of the duty of good faith.

On the first point, we must agree with the Appellees. The Credit Agreement and Individual Guaranties in this case were clearly "part of the same transaction." *See* 11 <u>Williston on Contracts</u> § 30:25. Indeed, the parties do not dispute this Court's prior characterization that the Appellees were required to  enter into the Guaranties "[a]s a condition to lending money to Southland Transportation." Additionally, the Credit Agreement specifically references the Individual Guaranties and provides that the Credit Agreement, as well as the other attached documents, such as the Guaranties, represent the agreement of the parties. Finally, the Guaranties  also make specific reference to the Credit Agreement: the Guaranties state that the terms used in the Guaranties will be defined using the glossary contained in the Credit Agreement. *See  McCall*, 503 S.W.2d at 183. Under these circumstances, we conclude that the trial court was required to construe the Credit Agreement and the Guaranties together.

In a somewhat similar case to the case-at-bar, two companies entered into an agreement to develop a subdivision. *Robert J. Denley Co., Inc. v. Neal Smith Const. Co., Inc.*, No.

W2006-00629-COA-R3-CV, 2007 WL 1153121 (Tenn. Ct. App. 2007). The parties signed a form agreement that incorporated by reference an agreement to arbitrate contained on another document. The facts were undisputed that the parties never discussed an agreement to arbitrate and never executed the document containing the arbitration clause. When a dispute arose, the plaintiff filed suit. Eventually, the defendant filed a motion to compel arbitration. The plaintiff argued that it had never signed any document requiring arbitration and that any document referenced in the contract to that affect was not binding, as there was no meeting of the minds on that term. *Id.* at *1. The trial court denied the motion and the defendant appealed. *Id.* at *2. The Court of Appeals reversed, holding that the parties had entered into an agreement to arbitrate. *Id.* at *3–4. The Court reasoned that because the agreement to arbitrate was incorporated by reference in the parties' agreement, "the two instruments are construed together as the agreement between the parties." *Id.* at *4 (citing *T.R. Mills Contractors, Inc. v. WRH Enters., LLC*, 93 S.W.3d 861, 870 (Tenn. Ct. App. 2002)). Thus, the agreement to arbitrate was binding on both parties.

In another case, *Hall v. Tennessee Workers Credit Union*, 2002 WL 31728875 (Tenn. Ct. App. Dec. 5, 2002), this Court considered whether a deed of trust, promissory note, and credit agreement should be construed together, even though the credit agreement was signed several years prior to the execution of the other documents. In concluding that they should be construed together, the Court noted:

> The terms of separate agreements forming integral parts of a single transaction may be considered together. Where several documents are integral parts of the same transaction, we will construe each of them in light of the other documents memorializing the transaction. *McCall v. Towne Square, Inc.*[,] 503 S.W.2d 180, 182–83 (Tenn. 1973); *Oman Constr. Co. v. Tennessee Cent. Ry.*, 212 Tenn. 556, 573-74, 370 S.W.2d 563, 570-71 (1963); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 599 (Tenn. Ct. App. 1999); *Stovall v. Dattel*, 619 S.W.2d 125, 127 (Tenn. Ct. App. 1981)

*Hall*, 2002 WL 31728875, at *7. The Court first noted that the documents signed by the plaintiffs specifically incorporated the earlier credit agreement. The Court, thus, concluded that the earlier credit agreement, deed of trust, and promissory note were integral parts of the same transaction. In *Hall*, the earlier credit agreement provided that the loan could be accelerated for default. The deed of trust conveying the real property provided that failure to pay insurance and taxes was an event of default. Because the contracts were construed together, the Court concluded the creditor was entitled to utilize the credit agreement acceleration clause when an event of default occurred under the deed of trust. Thus, the terms

48

of all the agreements were construed as one.

Although we recognize that other Courts have come to different conclusions, we note that these decisions have focused on the fact that the two contracts at issue did not specifically reference the other. For example in ***Saeedpour v. Virtual Medical Solutions, LLC***, 2013 WL 1400616 (Tenn. Ct. App. April 5, 2013), this Court held that a Purchase Agreement and a Money Back Guarantee were not to be construed together. The Court reasoned:

> Neither agreement, however, refers to the other or incorporates the other by reference. No language within either agreement indicates that the parties intended for the agreements to be construed together. To the contrary, the language of the Purchase Agreement states:
>
> 14. ENTIRE AGREEMENT
>
> This instrument . . . constitutes the entire and only agreement between the parties hereto . . . .

***Id.*** at *6. Thus, there was nothing in the parties' agreement that evinced an intent to construe the agreements together.

The facts of this case are in favor of a finding that the documents must be construed together. Here, the party to be held to conform to their agreement is SecurAmerica. SecurAmerica has not argued, and indeed, cannot argue, that it was in any way uninformed as to the contents of the Credit Agreement. Like in ***Denley***, the Credit Agreement was specifically referenced in the Guaranties and *vice versa*. Although we recognize that the parties to the Credit Agreement and the Guaranties were different (*i.e.,* the Appellees signed one as representatives of a company and one as individuals), we conclude that it would be unreasonable to hold that the Guaranties and the Credit Agreement must be construed separately when the agreements were entered into as part of the same business transaction, one agreement was a condition precedent to the other, there is no dispute that the parties were fully aware of both agreements, and both contracts specifically reference the other. Accordingly, both the Credit Agreement and the Guaranties are properly considered in order to determine whether SecurAmerica breached the duty of good faith.

### 2. Breach

SecurAmerica next argues that even considering the terms of both the Credit Agreement and the Guaranties, it did not breach the duty of good faith and fair dealing

because neither the Credit Agreement nor the Guaranties place any duty on SecurAmerica to ensure the collateral was sufficient to cover the indebtedness. SecurAmerica points to the language of the Credit Agreement, the nature of the Guaranties at issue, as well as the express waivers contained therein. We begin first with the language of the Credit Agreement.

First, SecurAmerica argues that neither the Appellees nor the trial court can point to any specific, express provision of the Credit Agreement that has been breached in this case. Essentially, SecurAmerica argues that neither the Credit Agreement nor the Guaranties place any affirmative obligation on SecurAmerica to ensure that the advances conform to the accounts receivable. Thus, SecurAmerica contends that it did not breach any of the express terms of the contract and, therefore, cannot be found in violation of the duty of good faith and fair dealing. To support this contention, SecurAmerica relies on the Tennessee Court of Appeals case of *Beach Community Bank v. Labry*, W2011-01583-COA-R3-CV, 2012 WL 2196174 (Tenn. Ct. App. June 15, 2012), which held that a guarantor's failure to show breach of a specific provision in a guaranty agreement was fatal to a claim of good faith and fair dealing. *Id.* at *11. Beach Community Bank was decided under Florida law, which specifically required that the covenant of good faith "relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements." *Id.* (quoting *Ament v. One Las Olas, Ltd.*, 898 So.2d 147, 149 (Fla. Dist. Ct. App. 2005)). However, the holding in *Beach Community Bank* is supported by Tennessee law:

> "The implied covenant does not . . . 'create new contractual rights or obligations, nor can it be used to circumvent or alter the specific terms of the parties' agreement.'"[*Ike v. Quantum Servicing Corp.*, No. 11-02914, 2012 WL 3727132, at *5 (W.D. Tenn. 2012)] (quoting *Goot [v. Metro. Gov't of Nashville and Davidson County*, No. M2003-02013-COAR3-CV,] 2005 WL 3031638, at *7 [(Tenn. Ct. App. Nov.9, 2005)]). "Notably, a breach of the implied covenant of good faith and fair dealing is not an independent basis for relief, but rather 'may be an element or circumstance of recognized torts, or breaches of contracts.'[*Weese v. Wyndham Vacation Resorts*, No.: 3:07–CV–433,] 2009 WL 1884058 [at *5 (E.D. Tenn. June 30, 2009)] (quoting *Solomon v. First Am. Nat'l Bank of Nashville*, 774 S.W.2d 935, 945 (Tenn. Ct. App. 1989)). "Thus, 'absent a valid claim for breach of contract, there is no cause of action for breach of implied covenant of good faith and fair dealing.' " *Ike*, 2012 WL 3727132, at *5 (citing *Envoy Corp. v. Quintiles*

*Transnat'l Corp.*, No. 3:03cv0539, 2007 WL 2173365, at *8 (M.D. Tenn. July 26, 2007 (applying North Carolina law)).

*Berry v. Mortgage Elec. Registration Systems*, No. W2013-00474-COA-R3CV, 2013 WL 5634472, at *7 (Tenn. Ct. App. Oct. 15, 2013); *see also Duke v. Browning-Ferris Industries of Tennessee, Inc.*, No. W2005-00146-COA-R3-CV, 2006 WL 1491547, at *9 (Tenn. Ct. App. May 31, 2006), *perm. app. denied* (Nov. 13, 2006) (holding that a breach of the duty of good faith is merely an element of a claim for "recognized torts, or breaches of contracts"). Thus, SecurAmerica argues that without a finding of a specific breach of contract, the trial court should not have found a violation of the duty of good faith. We thus turn to consider the trial court's findings with regard to this issue.

While the trial court generally sets out the law regarding the implied duty of good faith, in reaching the decision that the duty was breached in this case, the trial court merely states: "This Court finds that the [Appellees'] affirmative defense alleging that SecurAmerica violated the implied covenant of good faith and fair dealing is valid and was shown through the testimony of [Mr.] Harrell and [Mr.] Reagan, individually and on behalf of SecurAmerica." Thus, the trial court fails to identify which of the provisions contained in either the Credit Agreement or the Guaranties was not performed in good faith in this case.

The Appellees urge this Court to affirm the trial court's judgment despite this deficiency, pointing to the provisions in the Credit Agreement pertaining to the limits placed on borrowing. Indeed, as discussed above, the Credit Agreement specifically provides that advances "shall not exceed an amount . . . equal to the lesser of (A) [$1.5 million], [and] (B) 85% of Eligible Accounts[.]" The Credit Agreement goes on to state that SecurAmerica "in the exercise of its sole discretion exercised in good faith, may establish and increase or decrease the allowance . . . [or] impose additional restrictions (or eliminate the same) to the standards of eligibility set forth [previously]." Thus, it appears that the Appellees are arguing that SecurAmerica did not exercise good faith in continuing to lend to Southland Transportation once it was notified that the advances were in excess of 85% of the eligible accounts receivable.

In contrast, SecurAmerica argues that the above language does not create an affirmative duty to ensure that the advances made by SecurAmerica were sufficiently collateralized, pointing to the nature and language of the Guaranties. First, SecurAmerica argues that even if the above language creates a cap on the lending allowed under the Credit Agreement, the language of the Guaranties allows SecurAmerica to depart from the lending cap. Indeed, the Guaranties provide that:

> The liability of the Guarantor under this Guaranty shall be

51

absolute and unconditional irrespective of:

\* \* \*

(b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Liabilities, or any amendment or waiver of any term of or any consent to departure from the Agreement or any other Loan Document; . . . .

Further, the trial court made a specific finding that Mr. Reagan's actions were "clearly" within his power pursuant to the Credit Agreement. Accordingly, SecurAmerica argues that it was at liberty to depart from the Credit Agreement and that any such departure did not constitute a defense to the enforceability of the Guaranties.

Next, SecurAmerica directs this Court's attention to the trial court's finding that the Guaranties at issue are "continuing," unconditional, and absolute. The language of the Guaranties specifically provides that the Appellees "unconditionally and irrevocably guarantee[] the punctual payment and performance when due (whether at stated maturity, by acceleration or otherwise) of **all** of the Liabilities." (emphasis added). According to SecurAmerica, "[a]n absolute and continuing guaranty may be cancelled or terminated only as stated in the guaranty or by the acceptance of a new guaranty as a replacement for the prior one." *First American Nat. Bank of Nashville v. Hall*, 579 S.W.2d 864, 868 (Tenn. Ct. App. 1978). Thus, SecurAmerica asserts that the Guaranties are not voidable merely due to the "erosion of the collateral or any other circumstance" not specifically stated in the Guaranties to constitute termination of the agreements.

A continuing guaranty is one which is not limited to a particular transaction or specific transactions, but which is intended to cover future transactions until revoked. *Third Nat. Bank in Nashville v. Friend*, 626 S.W.2d 464, 647 (Tenn. Ct. App. 1981) (citing *Farmers-Peoples Bank v. Clemmer*, Tenn. 1975, 519 S.W.2d 801; *Mountain City Mill Co. v. Lindsey*, 8 Tenn. App. 337 (1928)). "A contract of guaranty is continuing in nature, if it contemplates a future course of dealing during an indefinite period or is intended to cover a series of credit transactions or to give the principal a standing credit to be used from time to time." 23 Williston on Contracts § 61:45 (4th ed.). American Jurisprudence further discusses the distinction between a continuing, absolute guaranty and a conditional, limited or restricted guaranty:

A guaranty may be either a "restricted guaranty," which is limited to a single transaction, or a "continuing guaranty," which is not limited to a single transaction but contemplates a

future course of dealing encompassing a series of transactions. The guaranty is restricted if it is limited to a single transaction or a limited number of transactions and is not effective with regard to transactions other than those guaranteed. A guaranty is continuing if it contemplates a future course of dealing during an indefinite period, or is intended to cover a series of transactions, an overall debt, or all future obligations of the principal to the obligee, and is frequently used in connection with a line of credit. A continuing guaranty covers all transactions, including those arising in the future, that are within the contemplation of the agreement and may include subsequent indebtedness without new consideration being given.

The determination whether a guaranty is continuing or restricted centers on the parties' intention, as revealed by the language of the guaranty—such as any money owed "now or at any time hereafter" or all obligations of a company under notes "however and whenever incurred" and "now existing or hereafter contracted"—as construed in view of the circumstances.

38 Am. Jur. 2d Guaranty § 17. This Court previously discussed the framework to determine whether a guaranty is continuing and absolute or conditional and limited:

The authorities generally recognize that a guaranty of payment of a debt is materially different from a guaranty of collection thereof, the former being regarded as absolute and the latter as conditional. The guaranty of payment binds the guarantor to pay the debt at maturity in the event the money has not been paid by the principal debtor; and upon default by the latter, the obligation of the guarantor becomes fixed.

***Hassell-Hughes Lumber Co. v. Jackson***, 33 Tenn.App. 477, 232 S.W.2d 325, 329 (Tenn. Ct. App. 1949) (citing 24 Am.Jur. Guaranty § 17).

Here, SecurAmerica argues that the Guaranties at issue clearly and unequivocally state that they are unconditional and absolute. Based on the plain language of the Guaranties, we agree. The Appellees argue, however, that despite the fact that the Guaranties are absolute and unconditional, the terms of the Guaranties do not create a "continuing" guaranty obligation on the part of the Appellees. According to the Appellees, the Guaranties at issue were intended to cover only specific transactions and, therefore, are not continuing Guaranties.

53

Again, the trial court determined that the Guaranties as issue were continuing, but did not state its reasoning in reaching that decision.

From our review of the language of the Guaranties, we conclude that the Guaranties at issue are continuing in nature. First, the Guaranties specifically apply to "all Liabilities," up to a stated amount, rather than a specific transaction or series of transactions. The Guaranties, construed together with the Credit Agreement, clearly "contemplate[] a future course of dealing during an indefinite period." 38 Am. Jur. 2d Guaranty § 17. Indeed, the Guaranties and the Credit Agreement were entered into for the express purpose to provide Southland Transportation with future advances. Finally, the Guaranties specifically state that the Appellees "guarantee[] . . . payment" rather than merely collection. *See **Hassell-Hughes Lumber***, 232 S.W.2d at 329. Accordingly, the trial court did not err in concluding that the Guaranties at issue are continuing.

Despite the trial court's conclusion that the Guaranties are continuing, SecurAmerica next argues that the trial court failed to consider the continuing nature of the Guaranties and the expressed waivers contained therein in finding that SecurAmerica breached the duty of good faith. Indeed, the trial court's only indication of its reasoning regarding the breach of the duty of good faith is a statement that there was a "failure to preserve collateral." However, impairment of collateral is specifically waived as a defense to enforcement of the Guaranties. As previously discussed, the Guaranties contain specific waiver provisions, purporting to waive all defenses, including defenses based on departures from the agreement, impairment of collateral, and breach of warranty. In addition, as previously discussed, the Guaranties contain an express provision allowing SecurAmerica to depart from the terms of the agreement and waiving any defense based thereon. Thus, the only statements of breach noted by the trial court in its order, impairment of collateral and departure from the Credit Agreement, appears to have been waived by the Appellees in signing the Guaranties.

Tennessee Courts have upheld similar waivers in analogous situations. For example in ***Suntrust Bank, East Tennessee, N.A. v. Dorrough***, 59 S.W.3d 153 (Tenn. Ct. App. 2001), the Tennessee Court of Appeals considered impairment of collateral as a defense to a continuing guaranty. In ***Dorrough***, the guarantor signed two guaranties guaranteeing "any and all sums of money that may now, or may at anytime hereafter, be owing" by the debtor. *Id.* at 155. Like the Guaranties in this case, however, the guarantor was only liable on the guaranties up to a specific amount. *Id.* After the guaranties were signed, the creditor allowed the underlying note to become "under-secured" when the debtor, with the knowledge of the lender, released the collateral securing the underlying note. Unlike in this case, the guaranties at issue contained no express waiver of impairment of collateral. Regardless, the Court of Appeals ruled that the guarantor waived impairment of collateral as a defense to liability under the guaranties:

54

As a general rule, the surrender or release by a creditor without the consent of the guarantor of any security held at the time when the debt is guaranteed will operate to discharge the guarantor. *Ottenheimer Publishers, Inc. v. Regal Publishers, Inc.*, 626 S.W.2d 276, 279 (Tenn. Ct. App. 1981). A necessary component of this rule is that the guarantor must not consent to the release of the collateral. *Id.* The burden is on the creditor to show that the guarantor consented to the release of the collateral, and that consent is normally manifest in the note itself. *Id.* at 280.

* * *

There is a recognized exception to the general rule of discharge upon release of collateral where the debtor has consented to the release. *See Ottenheimer Publishers*, p. 280. In *FDIC v. Associated Nursery Systems*, 948 F.2d 233, 240 (6th Cir.1991), the Court found that even though the guarantor had no prior notice of the sale of certain assets, the guarantor had consented to the release of collateral through his signing of the continuing guaranty agreement.

* * *

While the guaranties do not contain specific language consenting to the release of collateral, they implicitly consent to such changes by the fact that it is a continuing guaranty securing all debts owing to the [creditor].

*Dorrough*, 59 S.W.3d at 156–57. The *Dorrough* Court explained that its holding was based on the nature of a continuing guaranty:

The reason lies in the distinction between a continuing guaranty and a specific or limited guaranty. A guarantor who guarantees a specific note, which is also secured by collateral, is responsible solely for that note. When he becomes a guarantor, his obligations are tied up with the specific note and his agreement to become a guarantor might hinge upon the fact that the note is secured by collateral. Thus, the potential risk of a guarantor on a particular note may not be altered by the unjustifiable impairment of the collateral by the creditor.

55

The circumstances of a continuing guarantor are far different, however. A continuing guarantor does not guarantee a particular note, but rather guarantees an overall indebtedness. A continuing guarantor is thus obliged to pay the debts of the defaulting principal whether those debts are secured by collateral or not. In short, a continuing guarantor cannot rely on the presence of collateral securing a particular note, absent a specific provision providing that the collateral secures all notes. *See Union Planters Nat'l Bank of Memphis v. Markowitz*, 468 F.Supp. 529, 535 (W.D. Tenn. 1979). As long as the continuing guaranty in this case was in effect, nothing prevented Toyota of Morristown from incurring new debts to plaintiff secured by no collateral whatever. Under these circumstances, the fact that the note in question was secured by collateral was largely fortuitous from the point of view of the continuing guarantor.

[The guarantor] claims that in signing the guaranty agreements, he relied upon the existence of collateral securing the debt and upon certain statements made by the Bank regarding the collateral. While the cardinal rule in the construction of contracts is to ascertain the intention of the parties, *Frizzell Construction Co., Inc. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999), where the contract is plain and unambiguous, the Court's function is to interpret the contract as written according to its plain terms. *Bradson Mercantile, Inc. v. Crabtree*, 1 S.W.3d 648, 652 (Tenn. Ct. App.1999). Accordingly, [the guarantor] cannot be relieved from his written obligation because of an unfortunate and erroneous assumption.

Where the guaranty is a continuing guaranty, there is no obligation to give notice to the guarantor that new obligations are being incurred for which the guarantor will be liable, absent a contractual undertaking to do so. *See Third National Bank in Nashville v. Friend*, 626 S.W.2d 464 (Tenn. Ct. App. 1981). As the Court in *Friend* stated:

> This Court is not entirely comfortable with the present state of the law as to continuing guaranties. However, it is part of the law of contracts which allows great freedom and latitude in the contracts which may be made by the parties, but places upon the parties a heavy burden to minutely examine

56

and understand what they sign.

626 S.W.2d at 467.

*Dorrough*, 59 S.W.3d at 157–58.

In this case, we have not only held that the Guaranties at issue are continuing guaranties like in *Dorrough*, but unlike in *Dorrough*, the Guaranties signed by the Appellees contain an express and unequivocal waiver of impairment of collateral. This waiver is clearly valid, based on the holding in *Dorrough*; however, the trial court does not appear to have considered the waiver in reaching its decision.

The Appellees argue, however, that regardless of the waiver of impairment of collateral, the duty of good faith "cannot be avoided unless the parties explicitly state their intention to do so." *See **Dick Broadcasting Co., Inc. of Tenn. v. Oak Ridge FM, Inc.***, 395 S.W.3d 653, 660 (Tenn. Jan. 17, 2013) ("To avoid the imposition of the implied covenant of good faith and fair dealing, the parties must explicitly state their intention to do so.") (citing 17A C.J.S. Contracts § 437 (2011)). It is undisputed that the Guaranties do not include an express waiver of the duty of good faith, and indeed, expressly require that some obligations be performed in good faith. However, as previously discussed, a breach of the duty of good faith must relate to an obligation expressly contained in the contract. These obligations may be disclaimed. Indeed, this Court has previously indicated that when considering liability under a continuing, absolute guaranty with express waiver provisions, like the Guaranties in this case, a lack of good faith in failing to inform the guarantor of financial issues affecting the collectability of the debt may not be sufficient to avoid liability, absent conspiracy or fraud. As we explained in *SecurAmerica I*:

> In *Transouth Mortgage Corp. v. Keith*, 1985 WL 4677 (Tenn. Ct. App. Dec. 24. 1985), this Court reviewed a judgment based upon a guaranty. The defendant in *Transouth* executed a personal guaranty in favor of the plaintiff bank guaranteeing an auto dealer's debt. *Id.* at * 1. The auto dealer defaulted, and the bank sued the guarantor. *Id.* The guarantor counterclaimed fraudulent concealment, alleging that the bank had a duty to inform the guarantor of the debtor's financial difficulties prior to the guaranty and "to notify the defendant when the plaintiff knew or should have known that [the debtor] was floor planning the same vehicle more than once, had sold some vehicles out of trust, and had written checks that bounced." *Id.* at *3. We stated:

57

[A]bsent a conspiracy which is not alleged, we hold that unless the guaranty agreement provides otherwise, there is no duty on the party to whom the guaranty is directed to notify the guarantor of the business practices or financial difficulties of the party whose performance is being guaranteed, whether such practices occurred prior to the execution or during the term of the guaranty and whether such activities were known or should have been known by the party guaranteed. To hold otherwise would make one party the de facto guardian of the other. Certainly in business practices one is required to act fairly and in good faith. *See* T.C.A. § 47-1-203. However, "fairly" does not mean hold the other's hand, and guide and properly advise him through the transaction. This is especially so when such tender care is not requested and the pleadings do not reveal such request. Absent a trust relationship or fraud, contracting parties are charged with the duty of looking out for themselves.

*Transsouth*, 1985 WL 4677, at *3 (emphases added); *see also Walker v. First State Bank*, 849 S.W.2d 337, 342 (Tenn. Ct. App. 1992) (noting, in a case with similar facts and result, that the guarantor had not plead that a conspiracy existed between the creditor and the debtor).

*SecurAmerica I,* 2011 WL 3808232, at *10–*11 (footnote omitted).

Thus, the Court in *Transsouth* held that although the duty of good faith and fair dealing is implied in guaranty contracts, the duty does not extend to require a creditor to whom a guaranty is made to notify the guarantor of the financial difficulties of the borrower, absent conspiracy or fraud. We have previously determined that the trial court did not err in declining to find fraud in this case. We have further held that the trial court must make additional findings of fact to support its TCPA claim. Without a finding of a violation of the TCPA, there can be no conspiracy. *See Foster Business Park*, 2009 WL 113242, at *16.   Further, without a finding of conspiracy, under the holding in *Transsouth*, it appears that there can be no avoidance of the obligations of the Guaranties.

58

Here, the trial court failed to make any findings as to what terms of either the Credit Agreement or the Guaranties were breached in holding that SecurAmerica breached the duty of good faith and fair dealing. In addition, the trial court failed to consider how either the continuing nature of the Guaranties or the express waivers contained therein affected the obligations of the parties in this case, nor did the trial court consider this Court's previous holding in *Transouth*. The question of whether a party materially breached an agreement is question of fact for the trier of fact. *Carter v. Krueger*, 916 S.W.2d 932, 934–35 (Tenn. Ct. App. 1995). The trial court's ruling on this issue is, thus, entitled to a presumption of correctness on appeal. Tenn. R. App. P. 13(d); *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2000). In light of the fact that we have vacated and remanded to the trial court to make appropriate findings to support its decision with regard to the Appellees' TCPA claim, we think it prudent to also remand this issue to the trial court for appropriate findings, taking into consideration the above considerations. All other issues are pretermitted.

## V. Conclusion

The judgment of the Circuit Court of Shelby County is affirmed in part, vacated in part, and remanded to the trial court for further proceedings, which are necessary and consistent with this Opinion. Costs of this appeal are taxed one-half to Appellant SecurAmerica Business Credit, and its surety, and one-half to Appellees Karl Schledwitz and Terry Lynch, for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE